MARY E. THIEDE *vs.* HENRY P. STARTZMAN ET AL.

*Undue Influence—Confidential Relations—Burden of Proof as to Fairness of Transaction—Conveyance of All of Her Property Executed by an Old Woman Vacated.*

If one person reposes trust and confidence in another, and the latter obtains from the former a conveyance of property, then if the grantor seeks to have the conveyance annulled on the ground that it was not his voluntary act, the burden of proof is thrown upon the grantee to show that he made a reasonable use of the confidence reposed in him; that the transaction was fair, and was the voluntary act of the other party. Unless that burden of proof be met, the conveyance will be annulled, although there be no positive evidence that it was procured by fraud or overweening influence.

An old woman owning several pieces of real and leasehold property, part of which was subject to mortgages, executed a deed of trust conveying all of her estate to one of her sons and a son-in-law, with directions to pay a small sum annually to the grantor's husband during his life and the balance of the net income to the grantor, but to an amuont not exceeding $900 per annum, and upon her death to convey the property to the persons she should designate by will, and in default of such will to her heirs. The evidence shows that her purpose in executing the deed was to put someone in charge of her property to collect the rents, discharge current expenses and to pay over the whole balance of the income to her; that she reposed entire confidence in the grantees at whose instance the deed was prepared; that at the time of executing it no

explanation of its legal effect was made to her, and that when she was afterwards informed of its real meaning she expressed her surprise and dissatisfaction. *Held,* that there was a confidential relation existing between the grantor and the grantees, and since the latter have failed to show that the transaction was perfectly fair and the voluntary act of the grantor, and since the deed operates to deprive her of all control over her property and gives her an annuity considerably less than the amount of the income after deducting all charges, the grantees have failed to show that the transaction was a righteous one, and the deed should be annulled.

*Decided June 22nd, 1910.*

Appeal from the Circuit Court of Baltimore City (HARLAN, C. J.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, BURKE, THOMAS and PATTISON, JJ.

*Edgar H. Gans* and *Vernon Cook* (with whom was *Charles Markell* on the brief), for the appellant.

*Charles McH. Howard* and *Duncan K. Brent,* for the appellees.

PEARCE, J., delivered the opinion of the Court.

This appeal is from a decree of the Circuit Court of Baltimore City dismissing the bill of complaint of the appellant, Mary E. Thiede, in which she sought to have set aside, and declared null and void, a deed of trust made by her on December 31st, 1908, to the appellees Henry P. Startzman and William F. Thiede, Jr., the latter being her son and the former her son-in-law. By this deed she divested herself absolutely of the title to all her estate consisting of valuable fee simple and leasehold property in Baltimore City having a gross rental value of about $3,200 per annum, only reserving to herself an annual income which cannot exceed, and

may be less than, $900, also the power of disposition by will of the corpus of the estate. The most valuable parcel is a fee simple lot on North Eutaw street having on it a store building occupied by a large and successful merchant and renting for $2,500 per annum. This property is subject to two mortgages aggregating $5,000. Another parcel is leasehold property on the same street renting for $690 per annum, and is subject to a ground rent of $240 per annum and a mortgage for $1,500. There is also a house on Carrollton avenue, accupied by her as her home which is leasehold property subject to a ground rent of $114 per annum, and which is valued at $4,000 subject to said ground rent. Two other parcels of unimproved land in Waverly are wholly unproductive and the record does not disclose their value.

Mrs. Thiede was sixty-eight years of age when this deed was executed, and had been since 1897, living apart from her husband Wm. F. Thiede, Sr., now eighty-six years of age, who had left her because of a quarrel with their youngest son, Gustav A. Thiede, in which Mrs. Thiede sided with her son. All of Mrs. Thiede's property was conveyed to her by her husband in 1881, she paying him an annuity of $460, which is an additional lien upon all said property. When this deed of trust was made there were three years' taxes due upon this property, and some water rents in arrear, amounting to near $3,000, and some personal debts of about $1,000, the whole indebtedness being about $10,000.

Mrs. Thiede has three living children, Wm. F. Thiede, a druggist; Mrs. Anna G. Startzman, wife of Henry P. Startzman, a clerk in the B. & O. R. R. office, and Dr. Gustav A. Thiede, a physician. She has also a granddaughter, Louise Ashman, an orphan without property, who was given by her mother to Mrs. Thiede, and who is supported by her, though now twenty-three years of age.

In order to understand the situation, existing at the execution of the deed of trust it will be necessary to recur at some length to the record. Mr. and Mrs. Startzman lived

with Mrs. Thiede after their marriage until the quarrel with Dr. Theide, when they left the house, with Mr. Wm. F. Thiede, Sr., and Mrs. Startzman never entered the house again until Dr. Thiede left in 1908. Mr. Startzman paid board for himself while with Mrs. Thiede, but she declined to receive board for Mrs. Startzman. Dr. Thiede was not twenty-one when this quarrel occurred. His version is that his father struck his mother and blacked her eye, and that he interfered to protect his mother; that his father and Mr. Startzman had him arrested and charged with assault, but that the charge was dismissed by the grand jury. Mr. Startzman is silent as to any assault by Mr. Thiede on his wife, but states that Dr. Thiede assaulted him with a knife on a later occasion and he had him arrested but the grand jury dismissed the charge.

The record does not show who was in fault in that matter, but it does show that there was bad feeling as a result and a permanent rupture of relations between Mr. and Mrs. Startzman, and Wm. F. Thiede, Jr., and Dr. Thiede. He was Mrs. Thiede's youngest child, and she paid for his medical education, and he continued to live with her until 1908, when he was able to maintain himself, and took a house of his own. After that, Mrs. Startzman paid weekly visits to her mother at her residence. Wm. F. Thiede, Jr., does not appear to have visited his mother at her residence after the quarrel referred to except at Christmas seasons, but their relations were not ruptured, she visiting him at his residence. Her grandchild, Miss Ashman, has always lived with her. and it appears has been educated by her and treated with the utmost affection and liberality.

In 1897, upon leaving Mrs. Thiede, her husband filed a bill in equity against her, charging that his absolute conveyance of the property heretofore mentioned, to her, was in fact made in trust for the benefit of their family. This was denied by Mrs. Thiede, but pending this litigation receivers were appointed by consent, who for two years had charge of

the Eutaw street property upon which taxes and other charges to a considerable amount were in arrear.

In 1899, the receivers were discharged, Mr. and Mrs. Thiede joining in the mortgage of $4,000 before mentioned, to pay these taxes and charges, and Mr. Thiede abandoned his bill, Mrs. Thiede agreeing to pay him $5.00 a week which was secured by a lien on the property. In 1901, in order to procure Mr. Thiede's joinder in a lease of the larger Eutaw street property for a longer period at an increased rent, Mrs. Thiede increased Mr. Thiede's annual payment by the addition of $200 out of that rent, bringing his annuity up to its present rate of $460. Subsequent to this, the other Eutaw street property was vacant from time to time, and on that account, and because of considerable necessary repairs to all the property, Mrs. Thiede got behind again in taxes until in the fall of 1908 it became necessary to borrow more money for the payment of these taxes, for which she applied to Mr. J. Leland Hanna, an attorney, who had previously aided with temporary loans for that purpose. She then needed $1,500, and to procure this it was necessary to give a mortgage, in which Mr. Thiede should join, which he refused to do, and Mr. Hanna then suggested to Mrs. Thiede that "the property should be put in the hands of some one—himself, or some one else—*with power to collect the rents, pay the expenses, and pay the balance over to Mrs. Thiede.*" He told her of the possibility of another receivership, which he said she seemed to dread greatly, and she objected to paying commissions for the collection of Brager's rent which was always promptly paid.

In November, 1908, Mr. Thiede told his daughter, Mrs. Startzman, that unless something was done he was going to have a receiver appointed and Mrs. Startzman told her mother shortly after what he had said. A little later Mrs. Startzman told Mrs. Thiede that Mr. Hanna had told her there were three ways in which the affairs could be straightened out: first, by an amicable arrangement between Mr. and

Mrs. Thiede, which Mrs. Startzman said would be hopeless, as what would be agreeable to one would not be to the other; second, by the appointment of a receiver; and third, by some-one taking it in hand in the manner previously suggested by Mr. Hanna to Mrs. Thiede. Mrs. Startzman said she hated to see her mother pay commission as she had little enough to live on as it was, and she urged her husband Mr. Startz-man *"to take it over and manage it for her mother so she would save the commissions,"* and he finally reluctantly con-sented provided Wm. F. Thiede, Jr., would act with him in the matter.

When Mrs. Startzman told her about the receivership Mrs. Thiede burst into tears and said "if a receiver was appointed Mrs. Startzman would never see her again, and that she did not want to turn over the management of the property to anyone, but that before the interview was over she consented to turn over the collection of the rents and their application to the expenses to Mr. Startzman and Wm. F. Thiede, Jr., without commissions. Both Mr. Startzman and Wm. F. Thiede, Jr., testify that they told Mrs. Thiede they would only do this provided the arrangement was to be for her life, and not a temporary one, and that she understood and agreed thereto, and that they told her she could not depend under that arrangement upon receiving over $900 for the support of herself and Miss Ashman, and that while she was reluct-ant to accept that condition she finally did so.

Mrs. Startzman said that she never mentioned anything to her mother about a deed of trust and it does not clearly appear that she knew such a deed was in contemplation until after it was executed, and Mr. Startzman said that at his second interview with Mrs. Thiede late in December when she agreed to the proposition that he and Wm. F. Thiede should take the management of the property "that he had not the slightest idea in the world about the deed of trust, and had no idea what the legal paper would be," and that Mr. Brent who drew the deed did not suggest that form of

transaction until after several days consideration of the matter, but that when it was suggested he told Mrs. Thiede Mr. Brent had advised them not to go into the matter unless she would execute deed of trust which would "convey all her property to them absolutely; in other words that it would be theirs to sell without any further signature of hers or her husband's," to which she objected that then she could not will it, and he then told her he would have a clause put in the deed giving her the power to will the property, with which she declared herself satisfied. There was no third person at this interview. Mrs. Thiede denied that either Mr. Startzman or Wm. F. Thiede, Jr., ever spoke to her of a deed of trust, or ever told her if they took charge of the matter it must be for the rest of her life, and Wm. F. Thiede admitted that on the only occasion when he talked with her about the affairs on December 21st, 1908, that he did not tell her she was to make a deed of trust "because he thought she knew it already."

When she went to Mr. Brent's office on December 31st, 1908, to execute the paper it was not completed, and Mr. Startzman took her to a moving picture show until it was completed. When they returned Mrs. Thiede said, Mr. Startzman was walking about, and Wm. F. Thiede, Jr., came in and was introduced to Mr. Brent and Mr. Startzman told her the paper was ready for her to sign, and showed her where to sign, saying "Put your name there, you do not have to turn it over," and she signed and acknowledged the paper and Mr. Startzman then conducted her to the elevator; that he told her to see that $900 was mentioned in the deed, but that this was all that was said about the paper; that she did not read it, nor was it read to her, nor was any statement made as to the character or contents of the paper; that she didn't know it was a deed of trust or that it was a paper which could not be revoked and that if she had known its true character that she would not have signed it; that she supposed it was a power to collect the rents—pay her $900 a

year, and apply the residue of the income to the expenses on the property, and that she did not discover it was a deed of trust until eight days after its execution when her son Gustav informed her that he had learned the paper was a deed of trust; that on the following day, January 9th, 1909, she went to the office of Gans and Haman who had been her attorneys for over twenty years, and asked Mr. Cook to examine and ascertain what the paper was, and that a day or two later she saw Mr. Cook again, who told her the nature of the paper, and she directed him to take steps to have it set aside.

Mr. Cook said Mrs. Thiede seemed incredulous when he informed her what she had signed, and burst into tears saying she could not have believed Mr. Startzman would deceive her in that way, and that as directed by her he wrote Mr. Wm. F. Thiede, asking an interview, and a few days later wrote both defendants informing them that he was instructed to bring suit to set aside the deed, and that Mr. Startzman called on him in response, and they had a long talk about the matter in which Mr. Startzman said he thought the deed was a wise thing for Mrs. Thiede and that he thought the property ought to be saved for her children and she ought not to be allowed to squander it, and the result was that he refused to have the deed set aside, and said if she attempted it he would expose the difficulties between herself and her husband and would disgrace her.

Mr. Startzman said that the sheets of the deed were not all ready when they returned to Mr. Brent's office, but as they came in from the stenographer, Mrs. Thiede held the original and he held the carbon copy, and told her to read all except the description of the property, and that he told her particularly that everything after the words "In trust and confidence" must be read, and told her if there were any questions she wished to ask, to ask them before the deed was signed, but he admitted that neither Mr. Brent, nor himself, nor Wm. F. Thiede, Jr., offered any explanation of the

character or effect of the deed. The latter testified that he read it, but that he did not read it to her because he understood she had read it before he came in, and that he did not see or hear any one read it to her or explain it to her.

Mr. Brent testified that Mr. Startzman introduced Mrs. Thiede to him on the day the deed was executed at his office and that as the sheets were completed by the stenographer he gave a carbon and an original to each and then went out, and that each time both were apparently reading something on these sheets; but he could not say what or how much Mrs. Thiede was reading; that his "whole idea was that he was employed to draw a deed apparently just on its face, and the relations seemed so friendly and amicable that ·he saw no reason why he should inquire whether Mrs. Thiede understood its provisions and his one idea was to keep in the back ground and let them do what they chose." He said he thought it was absolutely an amicable family arrangement understood by all concerned, and that the idea of anything being done that somebody did not want to do, or that the thing was being signed by fraud or over anxiety never entered his head, and that if it had he would have acted very ·differently. It is needless to say that so far as Mr. Brent's conduct is concerned there is nothing which can reflect upon him in the slightest degree, and that under the circumstances as they appeared from all the evidence he was justified in believing the transaction to be an amicable family arrangement fully understood by all parties.

Miss Ashman testified that she never heard a deed of trust spoken of until a week after its execution on Mrs. Thiede return from Dr. Thiede's house though she knew that it was proposed her uncles were "to take charge of the property, collect all the rents and pay all bills and give Mrs. Thiede an allowance until things were straightened out."

The deed conveys all the property to the defendants "in fee simple forever" in trust:

1st. To collect the rents and profits, and therefrom to pay

all the taxes, ground rents, interest on mortgages, repairs or improvements, and attorney's fees and Court expenses in the discretion of the trustees. 2nd. To pay W. F. Thiede, Sr., during his life the annual sum of $460 and the interest on a note of $600 held by J. Leland Hanna. 3rd. To pay the entire balance of rents and profits not exceeding $900 per annum to Mrs. Thiede. 4th. Power is given the trustees to sell any or all of the property in their discretion, and to reinvest the proceeds or to apply the same in their discretion to the payment of any mortgages or charges on the property. 5th. Upon the further trust on the death of Mrs. Thiede to convey the property granted, or such other property as might represent the proceeds of sale of the granted property to such person or persons as she should direct by her will, and in default of such will then to such persons as would be entitled thereto if she had died intestate without making said deed.

Upon the facts thus outlined the first question which arises is whether this case falls within the doctrine of confidential relations where the burden of proof is upon the grantee to establish to the satisfaction of the Court the perfect fairness of the transaction, and upon full consideration of the Maryland cases we are of opinion that it does.

In *Highberger* v. *Stiffler*, 21 Md. 352, the Court said: "Wherever a fiduciary relation exists, legal or actual, whereby trust and confidence are reposed on the one side, and influence and control are exercised on the other, Courts of Equity, independent of the ingredients of positive fraud, through public policy as a protection against overweening confidence, will interpose to prevent a man from stripping himself of his property. *Story's Eq.*, secs. 303-322. *The relation requires the parties to abstain from all selfish projects.* The general principle is, if a confidence is reposed and that confidence is abused, Courts of Equity will grant relief. In such cases it is not necessary to prove the actual exercise of overweening influence, misrepresentation.

importunity or fraud *aliunde* the act complained of * * *
The general rule is that he who bargains in a matter of advantage with a person placing confidence in him, is bound to show that a reasonable use has been made of that confidence, *a rule applying equally to all persons standing in confidential relations to each other."*

In *Todd* v. *Grove,* 33 Md. 194, JUDGE MILLER, sitting below, in an opinion adopted by this Court, said: "We fully assent to what is said by the Vice-Chancellor in *Billage* v. *Southee,* 9 Hare, 540, 'that no part of the jurisdiction of the Court is more useful than that which it exercises in watching and controlling transactions between persons standing in a relation of confidence to each other; and in my opinion this part of the jurisdiction of the Court cannot be too freely applied, either as to the persons between whom, or the circumstances in which it is applied; * * * and I shall have no hestitation in saying it ought to be applied, *whatever may be the nature of the confidence reposed or the relation of the parties between whom it has subsisted.* I take the principle to be one of universal application, and the cases in which the jurisdiction has been exercised—those of trustee and *cestue que trust,* guardian and ward, attorney and client, surgeon and patient, to be merely instances of the application of the principle.' " It is clear, from the emphatic adoption by this Court of the language above quoted from 9 Hare, that the terms "fiduciary relation" used in *Highberger* v. *Stiffler, supra,* is not necessarily, some technical relation created by, or defined, in law, but any actual reposing of confidence, however created or originating, where the other essentials to the exercise of this jurisdiction are found, and it is clear both from the testimony of Mrs. Thiede and of Mr. and Mrs. Startzman that she did repose entire confidence in the unselfishness of the motives of the appellees in accepting the trust, and but for that confidence would not have executed the deed of trust in question. In *Cherbonnier* v. *Evitts,* 56 Md. 276, this Court said: "It is

not inconsistent with the exercise of undue influence or artifice that the instrument assailed was executed voluntarily and with a knowledge of its contents." And the Court quoted with approval the language of LORD ELDON in *Hugenin* v. *Basely,* 14 Vesey, 275, where he said: "The question is not whether she knew what she was doing, had done, or proposed to do, but how the intention was produced; whether all that care and providence was placed around her as against those who advised her, which from their situation and relation with respect to her, they were bound to exert in her behalf."

Without attempting to recite all the details of the voluminous testimony in the case, or to reconcile what must be conceded to be serious conflicts between Mrs. Thiede and the defendants upon some important points there is enough undisputed evidence to warrant the conclusion that the deed should be set aside. As was said by JUDGE McSHERRY in *Whitridge* v. *Whitridge,* 76 Md. 77, "a brief reference to the leading and material circumstances preceding and accompanying the execution of the deed, will conclusively show that the paper was far from being her free, voluntary and unbiased act."

The plan originally proposed by Mr. Hanna, and under consideration by Mrs. Thiede was to put someone in charge of the property to collect the rents, pay current expenses and charges, and pay over the whole balance to Mrs. Thiede but this involved the payment of commissions upon the whole income. When Mrs. Startzman proposed that her husband and Wm. F. Thiede should act instead of Mr. Hanna or some one else, the only expressed purpose was to save the commissions for Mrs. Thiede (and we believe this was the only purpose of Mrs. Startzman in her suggestion) and it was not then proposed to change the plan offered by Mr. Hanna, except that that plan should continue for her life. It was only after she had accepted the substitution of the defendants for Mr. Hanna that the proposed form of the

VOL. 113                    19

transaction was changed to a deed of trust, and the restriction was placed upon the amount she was to receive annually, and it is apparent we think that she submitted to these changes only under her fear of the receivership threatened by her husband and held up to her with powerful effect by Mr. and Mrs. Startzman. In all that was done thereafter, the zeal of the defendants to make *their* wishes the sole guide of her conduct in the transaction, and the complete selfishness of their projects, from which, as we have seen, the law required them to abstain, became painfully conspicuous. The transaction was not an amicable family settlement as Mr. Brent's testimony shows he was led to believe. The family was hopelessly divided. Mrs. Thiede had long been separated from her husband by his own volition. Upon one side she stood with her youngest son and the granddaughter who had been committed to her care and confidence by her deceased daughter. On the other side stood her husband with her oldest son, and her married daughter with her husband, and there was a great gulf between them. The record does not disclose who was most in fault, but there was no hope of reconciliation, though it does appear that Mrs. Thiede always sought to maintain cordial relations with all her children, and that Mrs. Startzman seemed to regard her with some degree of affection. Under the impression that the transaction was a friendly family settlement, understood by all concerned, Mr. Brent's testimony shows that he did not inquire from Mr. Startzman, with whom alone he communicated, *what Mrs. Thiede's wishes* were in the matter, but only what his wishes were, and when for the first time he saw Mrs. Thiede when the deed was presented to her for execution, he did not read it to her, nor give her any explanation whatever of its nature or legal effect, but he testifies that if he had known the situation as now disclosed, he "would have acted very differently." This can only mean that he would have fully explained to her the nature and effect of the deed, and would have satisfied himself

that it conformed to her wishes and purposes as well as to those of the defendants. In view of her prompt and emphatic repudiation of the deed as soon as she learned from Dr. Thiede of the rumor of its character and was informed by Mr. Cook in response to her inquiry, of its legal effect, it cannot be doubted that it would never have been executed if she had understood that effect at the time it was executed. If it be assumed that she did actually read the language of the deed in the fragmentary form presented in the separate sheets as they came from the stenographer, it cannot be believed that an untrained and inexperienced woman of her advanced age, and under the stress of all the surrounding circumstances, was capable of properly understanding without a word of advice or explanation the legal effect of such a long technical legal instrument.

No hint of the proposed transaction was communicated in any way by either of the defendants to Dr. Thiede or Miss Ashman, nor did they suggest to Mrs. Thiede that those members of the family should be consulted or informed by her of what was proposed though they were both at least equally interested in the welfare of Mrs. Thiede, and equally entitled to consideration. Mrs. Thiede was bound in honor as well as in affection to provide, within her means for the granddaughter whose care she had assumed as a trust, so long as she continued to be dependent upon her for a support. Her children were all established in life, her daughter with a husband occupying a clerical position assuring a regular income, and her sons engaged in business, one as a druggist and one as physician. The chief natural object of her immediate solicitude was, and should have been this granddaughter, but the comfort of the aged mother and of the dependent granddaughter was lost sight of and disregarded in their selfish plan for the preservation of the property for their ultimate advantage.

In *Whitridge* v. *Whitridge, supra,* the Court, speaking of the deed then under consideration said: "No part of the cor-

pus of the estate can be used by her; it is placed absolutely beyond her reach, and she is wholly powerless during her life to advance a dollar of the property to her children, or to others whom she may wish to aid, no matter how desirable or meritorious such a step might be. In a word she has been deprived of all control over her own property and has been reduced by the deed to the position of a mere annuitant upon her own estate." In that case, however, the deed secured to Mrs. Whitridge the *whole of the net income of the property,* while in the case at bar Mrs. Thiede is limited for the support of herself and granddaughter in any event to the sum of $900 per annum, though a simple computation of the rents shown by the testimony to be now receivable—shows that there will be a surplus over all current expenses and charges, and the annuity of $900, of about $400; and upon the death of Mr. Thiede, which at his advanced age cannot in the course of nature, be far distant, that surplus income must necessarily be increased to near $900 by the falling in of his an annuity of $460. But no part of the corpus of the estate nor even a dollar of that surplus income can be applied by her either to the necessities and emergencies of her own old age, or for the welfare of her granddaughter to whom she has always been a mother. She protested against this inadequate and meagre allowance, yet she was told that upon careful consideration of all the circumstances this was the utmost net income which could be derived after payment of current expenses and charges. It is too plain for concealment that the design of the defendants was to dedicate every dollar of the income above $900 to the reduction of the existing mortgages on the property in furtherance of the avowed opinion and theory stated by Mr. Startzman "that the property should be saved for her children" and that to accomplish this purpose she ought to be reduced to the position in her old age of an annuitant upon her fee simple estate. The same selfish spirit, and purpose to dominate and control her use of her own property, which marked the inception of this

plan, is again in evidence, in the interview between Mr. Cook and Mr. Startzman, when Mr. Cook told him he was instructed to institute legal proceedings for setting aside the deed, and when he threatened if such suit was brought, that he would disclose family scandals and would disgrace her.

We do not think it necessary however to pursue the matter further or to refer to other reasons assigned in the appellee's briefs for setting aside the deed.

For the reasons stated we are unable to agree with the views of the learned Judge of the Circuit Court, whose decree must therefore be reversed.

> *Decree reversed, with costs to the appellant above and below, and cause remanded that a decree may be passed in conformity with this opinion.*