## TRIBULL *v.* TRIBULL ET AL.

[No. 32, October Term, 1955.]

*Decided January 6, 1956.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON, and HAMMOND, JJ.

*Jacob Blum,* with whom were *Norman M. Owrutsky* and *Lloyd S. Mailman* on the brief, for appellant.

*Robert J. Dougherty,* for appellees, Francis A. Tribull and Evelyn Tribull, his wife.

BRUNE, C. J., delivered the opinion of the Court.

The appellant, Paul A. Tribull, as one of the residuary legatees under the will of his mother, Anna B. Tribull, brought a suit in equity in the Circuit Court of Baltimore City against the appellees, Francis A. Tribull and Evelyn

Tribull, his wife, and against the executor of the estate of his mother and the Canton National Bank, to set aside a transfer of a savings deposit made by Anna B. Tribull from an account standing in her name alone to a trust form of deposit "for herself and Francis A. Tribull, joint owners, subject to the order of either, the balance at death of either to belong to the survivor." At the conclusion of the plaintiff's testimony the Chancellor granted what was in effect (though not in name) a motion by the individual defendants to dismiss the bill, and subsequently entered an order of dismissal. The appeal is from that order.

Two principal questions are presented. The first is whether a legatee may sue in equity to enforce a claim on behalf of the estate or may only take proceedings in the Orphans' Court to require the executor to sue. If the first question is answered in favor of the legatee's right to sue, the second question is whether or not he has established sufficient facts to maintain his suit.

Mrs. Anna B. Tribull was the mother of seven children, two of whom are Paul and Francis, who are parties to this suit. Another of her sons (John A.) is a priest; one of her daughters (Mary M.) is a nun. By her will, which was executed in September, 1951, Mrs. Tribull made bequests aggregating $2,500 to two Roman Catholic churches and to a missionary organization, bequeathed the greater part of her estate, consisting of stock valued at more than $30,000, to her two children who had gone into religious orders, and gave the residue of her estate in equal shares to her five other children.

Mrs. Tribull died of cancer on July 13, 1952, at a hospital to which she had been admitted on July 1, 1952.

The savings account which is the subject of this suit apparently had its origin prior to December 6, 1945. On that date the account, then amounting to $14,869.00, was put in the name of Mrs. Tribull in trust for herself and her daughter, Antoinette J. Tribull (now Mrs. Steinert), as joint owners, the balance at death of either to belong to the survivor, but it was subject to the order

of Mrs. Tribull alone. This account was numbered 20626 and is sometimes referred to below as the "first account." Mrs. Steinert, who is one of the residuary legatees, but is not a party to this suit, testified that she went to the bank with her mother when the first account was established and that the purpose of putting her (the daughter's) name on the bank book was to enable her to go to the bank to withdraw money for her mother when the latter needed it in case she was sick. It will be noted that because of the form of the account, withdrawals could be made only upon orders signed by the mother. Under the bank's practice it was necessary that the daughter, in order to make a withdrawal, produce both a withdrawal slip signed by the mother and the passbook.

Occasional withdrawals in amounts usually of two, three or four hundred dollars and in a few instances of five or six hundred dollars, were made at intervals varying from about one month to six months, but only one deposit, other than interest credited, was made, from December 6, 1945, until July 3, 1952. As a result, the account gradually declined during that period to $7,278.17. It remained, however, unchanged in form, although from 1947 until about May, 1951, there was a marked coolness between Mrs. Tribull and Mrs. Steinert. In or about May, 1951, Mrs. Tribull became sick and asked Mrs. Steinert to help her; and except for a time in May, 1952, when Mrs. Tribull was in the hospital, Mrs. Steinert took care of her until Mrs. Tribull was again admitted to the Lutheran Hospital on July 1, 1952. On that date Francis A. Tribull, one of the defendants, took his mother to the hospital in what proved to be her last illness.

Two days later, July 3, 1952, the first account was closed, and the balance then on deposit, amounting to $7,278.17, was transferred, upon the presentation of the passbook and a withdrawal slip signed by Anna B. Tribull, to her name alone in a new account, numbered 22842. A new signature card for this account, bearing

only Mrs. Tribull's signature, was filed with the bank. (This account, as it stood until July 8, 1952, is sometimes referred to below as the "second account.") This transaction was handled by Francis A. Tribull.

On July 8, 1952, the second account was changed, in accordance with a form of request bearing that date and signed by Mrs. Tribull, from her name alone to "Anna B. Tribull in trust for self and Francis A. Tribull, joint owners, subject to order of either, the balance at death of either to belong to the survivor." (This is sometimes referred to below as the "third account.") This transaction, too, was handled by Francis A. Tribull. A photostatic copy of the bank's ledger sheet shows that no change was made in the number of the account as a result of the change in favor of Francis A. Tribull. (The ledger sheet, for some reason which is not explained, reverses the names of the depositors and shows the account as "Francis A. Tribull in trust for self and Anna B. Tribull, joint owners," etc., but no point is made of this.)

No notice of either change in the savings account was given to Mrs. Steinert, who had been a beneficiary under the first account, or, it appears, to any of the other children of Mrs. Tribull until after her death.

The decedent also rented a safe deposit box in the vault of the Canton National Bank, and kept securities in it. This box was originally rented by the decedent and her husband in 1929. He predeceased her; and though the date of his death is not shown, it appears to have been prior to June 14, 1951, on which date the old rental agreement was terminated and a new one was entered into. Under the new lease, the decedent and Francis A. Tribull were the tenants, and access to the box might be had by either of them or the survivor. According to the bank's records access to the box was had after June 14, 1951, as follows: on July 20, 1951, by the mother only; on July 3, 1952, by the mother and Francis; on July 14, 1952, and on July 18, 1952, by Francis alone. It was stipulated in open court that it

was impossible for the mother to have visited the bank on July 3, 1952, the bank record to the contrary notwithstanding.

The mother entered the hospital on July 1, 1952, at which time her case was diagnosed as one of obstructive jaundice. On July 9th an abdominal operation was performed, as a result of which it was found that she had cancer of the gall bladder and that cancer involved practically every organ of the upper abdomen and that she was beyond the aid of surgery. She died on July 13, 1952.

All of the hospital records were introduced in evidence, and the surgeon in charge of the case was examined. Without attempting to review his testimony or the records in any detail, it may be said that the evidence shows, in general, that the patient was given a number of blood transfusions and that she was given sedatives and drugs to relieve pain, but not in sufficient quantities to put her to sleep. The doctor saw her daily and whenever he saw her she appeared to him to be rational. The nurse's notes for July 9 showed that at six o'clock that morning, which was a few hours before she was to be operated on, the patient was sitting on the side of her bed singing. That is the only instance of alleged irrational conduct during her hospitalization. There is also testimony by Mrs. Steinert that on two occasions when she visited her mother at the hospital, her mother was either very drowsy or would fall asleep. There was testimony that the decedent had been strong minded and domineering in the family. It is not clear just how much she might have changed in these respects at the time of her last illness; but it seems evident that she was a very ill person when she entered the hospital and that her condition grew progressively worse until her death less than two weeks later.

Following Mrs. Tribull's death, Francis A. Tribull went to the bank on July 18, 1952, and prepared an inventory of the securities in his mother's safe deposit box, all of which were duly turned over to Mr. Hofferbert as executor of Mrs. Tribull's estate. On July 21, 1952,

Francis A. Tribull closed the third account by making two withdrawals—one in the amount of $36.39 to pay the inheritance tax, and the other in the amount of $7,241.78 which was thereupon transferred to a new account in the name of Francis A. Tribull in trust for himself and his wife as joint owners, subject to their joint order, the balance at the death of either to belong to the survivor.

A meeting of Mrs. Tribull's children was held on some date, which unfortunately is not shown, at the office of her executor, who had been her counsel and who had drawn her will, and the will was read. It made no mention of the bank account and the executor knew nothing of it; but one of the children inquired about it and Francis then stated that it had nothing to do with the estate, that his mother had had his name put on the account and that it belonged to him personally. There was a rather lengthy discussion of the matter, which ended with Francis saying, in substance: "Well, if that's the way you feel about it, I will draw the money out and turn it over to Mr. Hofferbert and have him include it in the estate to be divided among all of you." A few days later Francis turned over all the securities belonging to his mother to Mr. Hofferbert, and Mr. Hofferbert then asked him about the bank account. Francis replied that he had not had time to draw it out but would do so in the next day or so and would let Mr. Hofferbert know. Not having heard anything more for several days, the executor telephoned to Francis and was informed by the latter that he had discussed the matter with his attorney, that the money belonged to him and that his attorney told him he did not have to return it to the estate. Mr. Hofferbert's testimony seems to indicate that this conversation took place on or just before August 8, 1952, and he stated that on that date he wrote to the other residuary legatees advising them of the conversation. His letter to Paul was offered in evidence, but was excluded as being hearsay as against Francis

and his wife. We think that it should have been admitted for its bearing on the executor's position.

The executor, in his answer, stated that "the refusal of Francis A. Tribull to turn over the funds in the account in the Canton National Bank to your Respondent was made known to the other residuary legatees under the Will, and none of them with the exception of the Complainant herein was disposed to take any legal action requiring Francis A. Tribull to pay these funds into the estate; that the said Paul A. Tribull stated he would take legal action against his brother Francis A. Tribull, and that he would engage his own attorney to do so." On the stand the executor testified that he "accepted * * * as final" Francis A. Tribull's refusal to pay over the fund.

## I. THE RIGHT OF THE LEGATEE TO SUE.

The question of the right of the complainant, a residuary legatee, to maintain this suit was not raised either by demurrer or by answer by any of the defendants. The decree recites that this issue was raised by the Court, and it was one of the grounds upon which the lower court dismissed the bill. In his oral opinion the Chancellor, after referring to the allegations in the bill that "the executor had neglected and refused to take any further action to recover this bank account for the estate", said: "In the testimony there is no refusal or neglect on the part of * * * the executor." He followed this by quoting from the executor's answer the allegations which we have referred to with regard to reporting to the residuary legatees the refusal of Francis A. Tribull to pay over the fund, the indisposition of any of them, except Paul, to take legal action to require Francis to pay these funds into the estate, and Paul's expressed intention to sue and to engage his own attorney. The Chancellor then expressed the view that the bill could be brought only by the executor, even if he had refused to sue, and that the residuary legatee's only remedy was to apply to the Orphans' Court for an order requiring the executor to sue.

The executor, in neither his answer nor his testimony, used the words "refuse to sue," but in accordance with the familiar saying that actions speak louder than words we are unable to agree with the conclusion of the Chancellor that there was no refusal or neglect to sue on the part of the executor. His action, in the light of the facts before him, including his investigation of the bank records pertaining to the account and his apparent acceptance of the lack of demand or desire on the part of the majority of the residuary legatees for action against Francis, was for practical purposes the equivalent of a refusal to sue. There is also a strong inference of acquiescence on his part in Paul's expressed intention to bring suit himself. Even if the executor's inaction did not amount to a refusal to sue, it showed, we think, that a formal demand for suit would have been futile. We see no more reason for requiring that a futile demand for suit be made in a case such as this than for requiring a minority stockholder of a corporation who wishes to bring a derivative suit to make a futile demand upon the Board of Directors to bring a suit on behalf of the corporation. See *Booth v. Robinson,* 55 Md. 419, 439; *Eisler v. Eastern States Corp.,* 182 Md. 329, 333, 35 A. 2d 118.

Whether or not this suit can be maintained at all by a residuary legatee—even though he is not barred by the absence of any refusal to sue on the part of the executor—is a substantial question. We have not been referred to, nor have we found, any case decided by this Court which is precisely on all fours with the instant case.

Primarily, of course, the administration of a decedent's estate is committed to the Orphans' Court. In *Wilson v. McCarty,* 55 Md. 277, at 280, it is said: "So long as assets can be found, which properly belong to the estate of the decedent, which have not been brought in and accounted for, the estate is not fully closed * * * If * * * there be assets which he [the executor] has not returned, or assets which can be recovered, which he

has not recovered, it is not only within the power and jurisdiction of the Orphans' Court to require the executor to discharge his duty, but it is the plain duty of the court to compel him. * * * Rev. Code, Art. 50, secs. 5, 6, 14, 15." *Marx v. Reinecke,* 145 Md. 311, 318-319, 125 A. 541, quotes more fully the paragraph of *Wilson v. McCarty* from which we have quoted. The statutory references in *Wilson v. McCarty* are to the Revised Code of 1878, and these Sections are now codified in Article 93 of the Code (1951 Ed.) as Sections 254, 265, 266 and 267. The last three sections deal with concealment of assets, which is not charged here. Section 254 has been amended several times since 1878, chiefly in connection with the estates of persons absent and unheard of for more than seven years. There was, however, an amendment made by Chapter 437 of the Acts of 1931 (which was after the decision in *Marx v. Reinecke*) which authorized the Orphans' Court to "pass such orders as in their discretion may be required in the course of the administration of estates for the transfer of personal property, both tangible and intangible, the title to which is not in dispute." In *Talbot Packing Co. v. Wheatley,* 172 Md. 365, 190 A. 833, this was held to preclude an Orphans' Court from trying a question of title as between an administrator and a separate claimant. This result, as that case shows, was in accord with the law as previously determined by a number of cases cited in the *Talbot Packing Co.* case.

Many of the cases which have dealt with the question of jurisdiction as between an equity court and an orphans' court are not directly in point because they involved questions of the right to proceed in equity by or against executors or administrators. Here, although the executor is a party, he has not invoked the jurisdiction of equity and he is not the real party in interest against whom relief is sought.

The claim sought to be asserted is of an equitable nature. It could have been asserted by the executor, had he seen fit to do so; and we may assume (without

deciding) that the Orphans' Court could have ordered him to bring suit to enforce it. Proceedings to that end could very easily have produced a preliminary contest between the present complainant and the executor, if the latter undertook to defend his inaction; and it is difficult to see how he could have done so without somewhat disparaging the claim.

In *Turk v. Grossman,* 176 Md. 644, 6 A. 2d 639, creditors of a decedent brought a suit in equity to reach some shares of stock which had belonged to the decedent and had been pledged by him and which were alleged to have been acquired by the defendants through fraud and collusion with the sole acting executor. This Court said (176 Md. at 669, 6 A. 2d at 651):

"A second ground of demurrer is that general unpaid creditors of the testator do not have the right to bring the suit. Normally the executor or administrator as the personal representative of the decedent is the proper party, so far as personalty is concerned, to bring the action at law or suit in equity in matters which relate to the estate. The general rule is subject, however, to some exceptions and limitations, as where the rights of a legatee, devisee or creditor are substantially affected by peculiar circumstances, as fraud or collusion on the part of the personal representative and the person against whom the suit is brought; and the refusal or inability of the representative to act. Equity in such instances does not permit the general rule to interfere with its paramount function to prevent a fraud and provide a remedy and an actor for its correction."

There is, of course, no charge of fraud or collusion against the executor in the present case.

In the companion cases of *Noel v. Noel,* 173 Md. 147, 195 A. 322, 173 Md. 152, 195 A. 315, controversies between the widow, who also was the administratrix of her husband's estate, and the husband's mother and his sister were involved, and the interests of the widow in her individual and representative capacities were in part antagonistic. The principal suit was one brought

in equity originally by the widow in her individual capacity alone, in which she later intervened in her representative capacity as a party plaintiff. Her right to sue was upheld against a demurrer. The holding in the equity case was very briefly summarized in the companion case (which involved a stay of proceedings in the Orphans' Court seeking the revocation of the widow's letters of administration pending determination of the equity suit) as follows:

"* * * Equity jurisdiction was sustained on that appeal because the jurisdiction of the Orphans' Court was inadequate and incomplete and did not include, as did the court of equity, the power of the determination of questions of partnership, of the creation of express and implied trusts and their associated relations of fiduciary and beneficiary, and the determination of title to personalty between conflicting claims on behalf of the estate of the intestate on the one hand, and the mother and sister of the intestate, on the other. In consequence of its more extensive jurisdiction, and of its superiority of remedy and relief, equity had paramount authority, and will retain its jurisdiction for such relief as may be necessary, and, while so exercising this jurisdiction, further proceedings on the pending proceedings in the Orphans' Court should be stayed."

See also *Boland v. Ash,* 145 Md. 465, 125 A. 801, and the cases therein cited. At 145 Md. 474, this Court cited a number of cases in support of the proposition that under certain circumstances a court of equity may assume jurisdiction of the estate of a decedent, and also stated the rule that in the absence of special and unusual circumstances which render the power of the orphans' courts insufficient to afford adequate relief, equity will not exercise such jurisdiction. The Court went on to say: "But where by reason of some inherent and constitutional limitation of its powers, the orphans' court, the forum in which relief would be naturally and ordinarily sought, is unable to afford a complete and satisfactory remedy, then equity will lend its aid." See also

*Alexander v. Leakin,* 72 Md. 199, and *Bennett v. Rhodes,* 58 Md. 78. In the latter case the right of residuary legatees to sue was upheld where one executor owed a large debt to the estate, the other united with him in construing the will erroneously so as to deny the existence of the debt and hence both executors refused to sue to collect it and both parties owing the debt were without means to pay it unless it was charged on their interests in the estate.

In the instant case the only remedy which the Orphans' Court could give would be to direct the executor to bring suit; that Court could not try the issue of the validity of the transfer of the bank account. Although the facts of this case are not so strong as those alleged in *Turk v. Grossman, Noel v. Noel, Boland v. Ash,* or *Bennett v. Rhodes,* all cited above, we think that they are sufficient to invoke the jurisdiction of an equity court. There is the unwillingness of the executor himself to bring the suit. There is his tacit assent to the suit being brought by Paul, which is confirmed by the absence of any objection on this score in his pleading. There is the practical effect of the passiveness of the executor to weaken or disparage the claim on behalf of the estate, and conversely to strengthen the position of the defendant, Francis. The claim is of an equitable nature. The problem, in the light of the authorities above referred to, is one of the exercise, rather than of the existence, of jurisdiction. We think that the case is one in which equity can give full relief and that all necessary parties are before the court. Undoubtedly, the case is one which falls short of the cases in which fraud or collusion on the part of the executor or administrator has been present as a factor supporting the exercise of equity jurisdiction. However, neither is essential to the exercise of equity jurisdiction in cases involving the administration of estates; the inadequacy of the powers of the orphans' court may be sufficient. *Alexander v. Leakin, supra.* See also 21 *Am. Jur.* page 940, *Executors and Administrators,* Section 1003.

## II. Sufficiency of Proof.

The bill alleges the establishment of the first account in December, 1945, with the daughter Antoinette (now Mrs. Steinert) as a joint owner, subject only to the order of the decedent, its closing and the establishment of the second account in the name of the decedent alone, on July 3, 1952. The bill then alleges that "on July 8, 1952, the said decedent was in her last illness with an extremely limited ability to get about and look after her own affairs; that while she was in this state, acting either under fraud, duress and [sic] undue influence of the Defendant, Francis A. Tribull, the account opened on July 3, 1952, by the decedent was changed so that it read: 'Anna B. Tribull in trust for herself and Francis A. Tribull, joint owners, subject to the order of either, the balance at death of either to belong to the survivor'; * * *." The next paragraph charged that this last transfer was invalid "because of the duress, fraud and undue influence practiced upon the decedent while she was ill, weak and dying, by the Defendant, Francis A. Tribull."

No demurrer was interposed to the bill, so that we are not confronted with the question as to whether or not the rather few facts asserted are sufficient to sustain a charge of fraud, duress or undue influence. The rules of good pleading where fraud is charged have often been stated. It is sufficient here merely to refer to *Miller, Equity Procedure,* Section 93, and the opinion in *Upman v. Thomey,* 145 Md. 347, 125 A. 860.

The first question on this branch of the case is whether or not the charges in the bill are sufficient to permit the plaintiff, without specific mention of a confidential relationship in the bill, to seek to establish his claim on the basis of there having been such a relationship. We think that he may. In *Mead v. Gilbert,* 170 Md. 592, at 606, 185 A. 668, Judge Offutt, who also wrote the opinion in *Upman v. Thomey, supra,* said for the Court: "Fraud is a generic term and includes constructive fraud as well as actual fraud. In this case, because of the relationship of the parties, the transaction was constructively

fraudulent and, apart from any question of actual fraud, will not be permitted to stand unless the beneficiary shows that it was the free, voluntary act of the donor and that her confidence was not abused." The relationship there was found to be a confidential one between an aged, ill and illiterate mother and her son; and the abuse of that confidence was held to constitute a fraud. Conversely, we think, a charge of fraud, actual or constructive, which is not challenged for sufficiency by a demurrer or by an equivalent objection in the answer, is enough to permit the introduction of evidence on the issue of a confidential relationship. The doctrine of confidential relations, it may be noted, is treated by *Pomeroy* under the heading "Constructive Fraud—Inferred from the Condition and Relations of the Immediate Parties to the Transaction." See *Pomeroy, Equity Jurisdiction,* 5th Ed., Vol. 3, Pt. II, Ch. III, Sec. IV, §943, 955, *et seq.*

In such cases as *Kernan v. Carter,* 132 Md. 577, 104 A. 530, and *Reeder v. Lanahan,* 111 Md. 372, 74 A. 575, the sufficiency of the bill was challenged by demurrer. *Gayle v. Fattle,* 14 Md. 69, and *Grove v. Rentch,* 26 Md. 367, were similar. The *Gayle* case was heard on bill and answer and the bill charged ignorance and inadvertence, but not fraud. In the *Grove* case, there were exceptions which amounted "virtually to a demurrer." On the other hand, in *Dennis v. Dennis,* 15 Md. 73, at 124, it was stated that: "Every material fact, to which the plaintiff means to offer evidence, ought to be stated; but a general charge or statement of the matter of fact is sufficient, and it is not necessary to charge minutely all the circumstances which may conduce to prove the general charge. These circumstances are properly a matter of evidence, which need not be charged in order to let them in as proof." Likewise, in *Canton v. McGraw,* 67 Md. 583, at 585, 11 A. 287, the Court said: "There is no rule of equity pleading which requires the pleader in charging fraud, to set out the *proof* by which he expects to maintain the charge; and while the law requires the fraud to be proved by clear and satisfactory testimony,

it allows a broad scope for the introduction of facts and circumstances bearing even remotely upon the question." Both of the above quotations are included in the opinion in *Upman v. Thomey, supra,* in support of a like conclusion there reached.

Our views on this point are strengthened by the absence of any perceptible surprise or prejudice to the individual appellees in the appellant's claim based upon an alleged confidential relationship. Indeed, the appellant's principal witness telephoned to the appellee, Francis, the day before she testified to discuss her testimony with him. Our views are further strengthened by the liberality with which amendments are permitted under Equity Rule 17 "in furtherance of justice."

In the light of the authorities above cited as to the scope of permissible testimony in support of a charge of fraud, we think that the Chancellor was in error in striking out the testimony relating to the safe deposit box of the decedent and Francis' right of access thereto. We shall accordingly take it into consideration.

The remaining principal question in the case is whether the plaintiff has offered proof of sufficient facts to establish the existence of a confidential relationship between the decedent mother and the defendant son, Francis, and so to throw the burden of proof of the fairness of the transaction upon that defendant. It is by no means free of difficulty.

There is no general presumption that a gift from a parent to a child is invalid. *Henry v. Leech,* 123 Md. 436, 91 A. 694; *Williams v. Robinson,* 183 Md. 117, 36 A. 2d 547. However, if the normal situation of the parties has become reversed, so that the child is in the dominant position, the burden of establishing the fairness of the transaction may be cast upon the child. *Willoughby v. Trevisonno,* 202 Md. 442, 97 A. 2d 307; *Gaggers v. Gibson,* 180 Md. 609, 26 A. 2d 395; *Mead v. Gilbert, supra; Upman v. Thomey, supra; Thiede v. Startzman,* 113 Md. 278, 77 A. 666; *Horner v. Bell,* 102 Md. 435, 65 A. 736; *Whitridge v. Whitridge,* 76 Md. 54,

24 A. 645; *Beinbrink v. Fox,* 121 Md. 102, 88 A. 106 (rule recognized, but gift upheld) ; *Highberger v. Stiffler,* 21 Md. 338. Actual fraud or undue influence is not necessary in order to vacate the deed. *Highberger v. Stiffler, supra; Todd v. Grove,* 33 Md. 188, *Willoughby v. Trevisonno, supra; Coburn v. Shilling,* 138 Md. 177.

This case is a battle of presumptions and of the shifting of the burden of proof. The form of the third account is sufficient to create the presumption of a valid trust and gift in favor of Francis. *Milholland v. Whalen,* 89 Md. 212, 43 A. 43; *Hancock v. Savings Bank of Baltimore,* 199 Md. 163, 85 A. 2d 770; *Whittington v. Whittington,* 205 Md. 1, 106 A. 2d 72. It is rebuttable as to whether a gift was intended. *Ragan v. Kelly,* 180 Md. 324, 24 A. 2d 289; *Bradford v. Eutaw Savings Bank,* 186 Md. 127, 46 A. 2d 284. It may be overcome, if a confidential relation existed at the time of the alleged gift, through the shifting of the burden of proof as to the fairness and reasonableness of the transaction. This burden of proof exists even though the gift may be testamentary in character, for it is incumbent upon the donee to show that the donor understood the nature of the transaction and intended to make a gift. See *Hancock v. Savings Bank of Baltimore, supra,* both the majority and the dissenting opinions, where the difference was primarily on the application of the rule to the facts. Thus if the plaintiff has adduced sufficient evidence, despite the absence of any presumption against the validity of a gift from a parent to a child, to establish a confidential relation in which the son, Francis, was the dominant party, then the burden of proof shifts to Francis.

"Advanced age, physical debility and mental feebleness are all facts carrying weight in determining whether a confidential relation in fact existed." *Gaggers v. Gibson, supra,* at 180 Md. 612-613, citing *Mead v. Gilbert, supra,* and *Gerson v. Gerson,* 179 Md. 171, 20 A. 2d 567. In the present case there is no evidence in the record to prove mental incapacity. There is, however, evidence of rapidly advancing physical debility. The hospital records

show that the decedent was able to walk into the institution on July 1, 1952, but that she had an incurable disease in an advanced stage and died twelve days after being admitted. Francis did not, prior to her going to the hospital, manage her business affairs, but he seems to have moved into them quite actively as to both her safe deposit box and her savings account as soon as he had taken her to the hospital. She had shown confidence in him by giving him joint access to the safe deposit box. There is no suggestion that he abused her confidence with regard to the contents of that box, and the evidence indicates quite the contrary; but giving him access to the box was certainly a mark of confidence.

The changes in the savings account seem on the evidence in the case, which is far from ample, to present a different kind of situation. The account from December, 1945, to early July, 1952, had been in a form in which the decedent had control of it, but the daughter, now Mrs. Steinert, had full ownership, if she survived her mother. Mrs. Steinert's testimony indicates, however, that the account was put in that form solely as a matter of convenience for the mother, and it is a noteworthy fact that Mrs. Steinert seems to have been quite consistent in adhering to this view, for she made no claim of ownership of the deposit after her mother's death. It is also worthy of note that during the period of estrangement between the decedent and Mrs. Steinert, the decedent made no change in the form of this account, though she made a number of withdrawals from it. Accepting Mrs. Steinert's view of the account as a matter of convenience for her mother as correct, we should find no ground for criticism of the transfer of the account to Mrs. Tribull's name alone, if the transfers had stopped there. But they did not. On the contrary a few days after the second account was established, the change to the third form was made, and for practical purposes, Francis took control. He arranged both transfers, and so far as appears took the initiative in doing so. He was the only one who dealt directly with the bank and he

must have been the one who obtained his mother's signature to the several documents required by the bank to accomplish the transfers. In view of the past history of this account and of the rather obvious need to have funds readily available for the payment of hospital expenses, a transfer to an account subject to the order of either Mrs. Tribull or of her son, Francis, who seems to have assumed charge of his mother's going to the hospital, would have been a matter of convenience. The form of the third account did not, however, stop there; it put Francis in the position of a joint owner. Mrs. Steinert's testimony as to the establishment of the first account, in which Mrs. Steinert was designated as a joint owner, though she stated that the purpose of the change was simply to enable Mrs. Steinert to make withdrawals for her mother, suggests strongly that Mrs. Tribull was not aware of the legal import of the form of account in trust for herself and another as joint owners, the balance on the death of either to belong to the survivor. There is nothing to show that she was any better informed on this subject at the time of her last illness. It is perfectly clear that in July, 1952, she had no contact with the bank otherwise than through Francis, and the bank official who made the changes for the bank made it clear that he had no conversation with her as to her wishes.

Francis' conduct with regard to this account both before and after his mother's death casts doubt upon his position. He told none of the other legatees of the change before his mother's death and he volunteered none afterwards. When the question of the account came up at the reading of the will, after a good deal of discussion, he said he would turn the account over to the executor. Later he claimed he had not had time to do so, though he continued to reassure the executor. After consulting counsel, which he was certainly entitled to do, he ultimately took the legal position that the account belonged to him and that he would not turn it over. (Because of

the incompleteness of the record, which does not show either the date of the reading of the will or the date of its probate, it is impossible to tell whether the account in the name of Francis and his wife was established before or after his promise to turn the fund over to the executor or his reassurances on that subject.)

We think that in spite of the paucity of the record, there was enough to show that the decedent, during her final illness, reposed confidence in and relied upon her son Francis in such business affairs as she then undertook, that she was somewhat advanced in years and was in very seriously weakened physical condition, and that Francis assumed charge of and exercised control over her business affairs at least insofar as her safe deposit box and savings account were concerned. These facts, we think, indicate that a confidential relationship existed, and the burden was therefore cast upon Francis to sustain the transfer of the savings account to himself as a joint owner with his mother, with right of survivorship.

His only effort so far to do so occurred during the cross-examination of Mrs. Steinert. He sought to show that the gift was made by their mother in recognition of his being "more loyal to her"—presumably more loyal than the other children. The answer upon which this contention is based is so garbled or confused as to be almost unintelligible. If that were the reason for the gift, perhaps it can be better developed at a later stage of proceedings.

In view of our holding that this suit may be maintained by a residuary legatee and our further holding that the evidence adduced was sufficient to show the existence of a confidential relationship, it will be necessary to remand the case for further proceedings not inconsistent with this opinion. Since the decree dismissing the bill was entered at the conclusion of the plaintiff's case and before the appellees had gone on with their case, we deem it appropriate to remand the case without affirming or reversing the decree, for further proceedings as stated above, with the right to any of the parties to offer addi-

tional testimony, and to apply for leave to make amendments to the pleadings in accordance with Equity Rule 17.

> *Case remanded without affirming or reversing the decree, for further proceedings not inconsistent with this opinion; with costs of this appeal to the appellant.*