*Peter Ibru v. Janet Ibru*, No. 100, Sept. Term 2017
Opinion by Leahy, J.

**Subject Matter Jurisdiction > Standing >Standard of Review**

We review *de novo* a circuit court's determinations of its own subject matter jurisdiction and a party's standing.  *See Holbrook v. Newell*, 231 Md. App. 451, 453 (2017); *Tomran, Inc. v. Passano*, 159 Md. App. 706, 723 (2004), *aff'd,* 391 Md. 1 (2006).

**Subject Matter Jurisdiction > Equity Jurisdiction**

As a general matter, a state equity court may not conduct "the administration of a decedent's estate," which is specially "committed to the Orphans' Court."  *Tribull v. Tribull*, 208 Md. 490, 499 (1956).

**Subject Matter Jurisdiction > Equity Jurisdiction > Principal-Agent Relationships**

The question of whether an agent became the joint holder of certain transfer on death accounts during the principal's lifetime—is "clearly one of title" placing the issue "beyond the jurisdiction of the Orphans' Court." *Libonati v. Ransom*, 664 F. Supp. 2d 519, 524 (D. Md. 2009) (citing *Tribull v. Tribull*, 208 Md. 490, 499-500 (1956)).

**Subject Matter Jurisdiction > Equity Jurisdiction > Principle-Agent Relationships**

The question of whether an attorney-in-fact fraudulently obtained and employed a power of attorney to become the joint owner of the principal's bank accounts is a question that is squarely within the scope of the circuit court's equity jurisdiction.

**Standing > Maryland General and Limited Power of Attorney Act**

The Maryland General and Limited Power of Attorney Act confers standing on a principal's descendant to "petition a court to construe a power of attorney or review the agent's conduct, and grant appropriate relief."  Maryland Code (1974, 2017 Repl. Vol.), Estates and Trusts Article ("ET"), § 17-103(a).

**Standing > Maryland General and Limited Power of Attorney Act**

Under the Maryland General and Limited Power of Attorney Act, when a power of attorney is created and executed in Maryland, the location of a principal's estate in another jurisdiction is not relevant to the issue of a party's standing to petition a court to review the power of attorney or an agent's conduct thereunder.

**Attorney's Fees > Scope of the Trial Court's Discretion**

A circuit court abuses its discretion by awarding attorney's fees without providing a justification for doing so and an explanation of how it calculated the award.

Circuit Court for Prince George's County
Case No. CAL16-24141

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 100

September Term, 2017

_____

PETER IBRU

v.

JANET IBRU

_____

Graeff,
Kehoe,
Leahy,

JJ.

_____

Opinion by Leahy, J.

_____

Filed: September 27, 2018

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018

Chief Michael Christopher Ibru[1] ("Chief Ibru")—a prominent and very wealthy Nigerian business magnate—traveled to the United States from Nigeria for a medical procedure related to his Parkinson's Disease. Shortly after the procedure, in 2008, Chief Ibru began living in Maryland with one of his daughters, Ms. Janet Osiorebruvbiho Ibru ("Janet" or "Appellee").[2] Chief Ibru purportedly executed a durable power of attorney in which he appointed Janet as his attorney-in-fact, and then roughly a year later, in 2010, he entered into a general power of attorney, again appointing Janet as his attorney-in-fact (collectively, the "Powers of Attorney"). In 2016, Mr. Peter Ibru, one of Chief Ibru's sons ("Peter" or "Appellant"), filed suit in the Circuit Court for Prince George's County to enjoin Janet from exercising her rights under the Powers of Attorney. He claimed that the Powers of Attorney were invalid because Chief Ibru was incompetent when he signed them, and, that Janet had fraudulently used them to gain access to his assets. While the case was pending, the court entered an order naming Janet as the temporary guardian of Chief Ibru so that she could continue to assist Chief Ibru with his medical needs.

Chief Ibru passed away intestate on September 6, 2016. Peter amended his complaint, requesting that, in addition to declaring the Powers of Attorney invalid, the

---

[1] According to the parties, the late Michael Ibru "was entitled to use the honorific of 'Chief'" "under the practices and customs of his home country of Nigeria." In his obituary, the African Examiner noted that "[a]s a traditional chief of his homeland, Ibru had the tribal honorific 'Olorogun' and often use[d] it as a pre-nominal style." Prominent Nigerian Industrialist Olorogun Michael Ibru Dies, African Examiner (September 6, 2017), *available at* http://bit.ly/2QUX0Vh.

[2] We will refer to the parties by their first names in this opinion. This informality is not meant to show any disrespect but intended only for clarity.

court establish a constructive trust for Chief Ibru's remaining assets in Maryland and order an accounting of Chief Ibru's assets for the entire time Janet acted as his attorney-in-fact. In response, Janet filed a motion to dismiss and requested attorney's fees. Janet averred that an estate case had been opened in Nigeria where the vast majority of Chief Ibru's assets and family reside and insisted that a Nigerian court would be best suited to handle the issues relating to Chief Ibru's property in Maryland. Six days later—before Peter responded to the motion—the trial judge granted Janet's motion to dismiss at a motions hearing. The court decided that "standing issues" precluded the court from considering Peter's petition for relief because the matter was actually an estate case. The court then awarded Janet $4,500 in attorney's fees. Peter appealed.

The central question in this appeal is the justiciability of Peter's claims in the circuit court.[3] We must determine whether the circuit court had subject matter jurisdiction to

---

[3] Peter frames his questions on appeal as follows:

1. "Did the Circuit Court err as a matter of law by ruling on, and granting, [Janet]'s Motion to Dismiss before [Peter]'s time to respond to the Motion to Dismiss had expired?"

2. "Did the Circuit Court err as a matter of law by considering extraneous information about Chief M. Ibru's Nigerian estate when it ruled on [Janet]'s Motion to Dismiss (thus converting [Janet]'s Motion to Dismiss to a Motion for Summary Judgment) and failing to provide [Peter] with a reasonable opportunity to present, in a form suitable for consideration on summary judgment, additional, pertinent information?"

3. "Did the Circuit Court err as a matter of law by finding [Peter] lacked standing and therefore dismissing [Peter]'s Original and Amended Complaint for failure to state a claim?"

2

consider Peter's petition and render a declaratory judgment,[4] and whether Peter had standing to bring the action below. Additionally, we consider whether the circuit court erred in awarding Janet attorney's fees.

We hold that the circuit court mistakenly determined the underlying action was an estate case and that it was precluded from exercising jurisdiction over the case. Next, we hold that Peter, as a descendant of Chief Ibru, had standing to petition the court to construe the validity of the Powers of Attorney and review Janet's actions as an agent under Maryland Code (1974, 2017 Repl. Vol.), Estates and Trusts Article ("ET"), § 17-103(a). Accordingly, we also resolve that the circuit court abused its discretion when it awarded attorneys' fees against Peter in favor of Janet without any findings or calculations.

## BACKGROUND

In late 2008, Chief Ibru traveled from Nigeria to the United States for medical treatment for Advanced Parkinson's Disease and related disorders. Roughly three weeks after arriving, Chief Ibru began living with Janet, one of his children, in Prince George's County. He remained in her care until his death.

---

4. "Did the Circuit Court err as a matter of law by awarding [Janet] attorney's fees without any legal or factual basis to do so?"

[4] The threshold issue in this case—although argued but not articulated as a question by the parties—is whether the circuit court had subject matter jurisdiction to consider Peter's claims. The parties agreed to this at oral argument, but, even if the issue was not raised at all by the parties, we have the authority to *sua sponte* consider issues of subject matter jurisdiction. *Lewis v. Murshid*, 147 Md. App. 199, 202-03 (2002) (citing *Cty. Council of Prince George's Cty. v. Dutcher*, 365 Md. 399, 405 n.4 (2001) (additional citations omitted)).

On February 17, 2009, Chief Ibru purportedly executed[5] a durable power of attorney (the "Durable POA"), naming Janet as his attorney-in-fact. The Durable POA gave Janet several powers incident to her role as Chief Ibru's caregiver, including:

**1.1 Bank Accounts**
To deposit in my name for my account in any banking or similar financial institution, all monies, bills of exchange, drafts, checks, promissory notes, and other securities for money payable or belonging to me, and for that purpose to endorse the same for deposit or collection, and to withdraw sums deposited with such financial institution[.]

* * *

**1.3 Sign Checks**
To draw and sign on my behalf any check, draft, note or other negotiable or non-negotiable commercial instrument which I might lawfully sign in person, whether as maker, drawer or endorser[.]

* * *

**1.6 Purchase**
To purchase such goods and items as my agent deems appropriate for my welfare and benefit and to accept and take possession of any property or interest or estate on my behalf.

**1.7 Medical Treatment**
To consent on my behalf to medical examinations and medical or other professional care, treatment or advice. My agent shall not be personally liable for consenting to medical care which results in injury to me resulting from negligence or acts and/or omissions of third persons unless my agent fails to act in good faith with respect to approving such treatment. . . . I hereby authorize my agent to obtain my individually identifiable health information and/or medical records, or consent to the use of my individually identifiable health information and/or medical records, for the purpose of obtaining medical care and treatment.

* * *

**1.23 General Authority**

---

[5] A thumbprint appears adjacent to the signature block on the Durable POA.

4

To do all such other acts and things in relation to all or any part of any interest in my property, estate, affairs or business of any kind or description as I might or could do if acting personally.

Roughly a year and a half later, on July 21, 2010, Chief Ibru purportedly executed[6] a general power of attorney (the "General POA"), again appointing Janet as his attorney-in-fact. The General POA allowed Janet "[t]o do anything [Chief Ibru] could do [him]self with regards [sic] to bank accounts, accounts at savings and loan institutions, credit unions and any other institution, including opening, modifying and closing such accounts and signing and endorsing checks or drafts of any kind." It also empowered Janet "[t]o make decisions [] and to authorize medical treatment" on Chief Ibru's behalf, which included

accepting treatment in an emergency event or in the ordinary event, to agree to medical procedures which are suggested by [Chief Ibru's] physician or any treating physician, to determine whether a treatment is necessary or desirable, to consent to an operation, to decline treatment on [Chief Ibru's] behalf, and to make any other medical decision that [Chief Ibru] could make [him]self.

For nearly six years, Janet assumed the role of primary caretaker for Chief Ibru. During this time, his physical and mental health further deteriorated,[7] and by April 2016, he required rigorous medical treatment and constant monitoring.

---

[6] A handwritten "X" appears above the signature block on the General POA.

[7] On August 15 and 16, 2016, Chief Ibru underwent both physical and neurological exams. The physicians who cared for Chief Ibru over the previous six years reported that he was suffering from "Advanced Parkinsons Disease with Dementia[,]" was awake during the examination but completely unresponsive, was incapable of "making or communicating any responsible decisions concerning his[] []person and/or []property[,]" and did not "have sufficient mental capacity to understand the nature of a guardianship and consent to the appointment of a guardian." Although these tests were conducted in August of 2016, Peter contends that Chief Ibru "ha[d] suffered from these ailments for a lengthy period of time prior to 2009."

5

On May 26, 2016, Peter filed a complaint in the circuit court which sought, among other things, to declare the Powers of Attorney null and void, alleging they were "fraudulent and unenforceable, as a matter of law, because [Chief] Ibru did not execute such document[s]." In addition, Peter entreated the court to infer that because Chief Ibru was unable to "even sign such [] important document[s]" due to "severe adverse health" issues, they were "in fact a product of fraud and or duress."

The next day, on May 27, 2016, the circuit court granted a temporary restraining order ("TRO") and enjoined Janet "from exercising any right or authority purportedly granted to her" under the Powers of Attorney. The court set in a hearing on the TRO for July 22, 2016. In response, Janet filed an emergency motion to rescind the injunction and request for a hearing, alleging that Chief Ibru was mentally competent when he "signed" the Powers of Attorney, and implored the court to "rescind[] the injunction until the hearing . . . to preserve [Chief] Ibru's health and life." The court deferred ruling on Janet's motion until the July 22, 2016 hearing.

At the hearing on July 22, 2016, the court decided to appoint Janet as temporary guardian of Chief Ibru, noting that Chief Ibru had been living in Janet's home for "about eight years[,]" and saw "no good reason to upset that right now." The court explained:

> It is my proposal, if everyone is agreed, we will appoint a temporary guardian so all of his property goes under court supervision, the guardianship of the person as well, to manage his affairs.
>
> We agree that the two of you will give me a list of three names of physicians, that I can pick one off the list to go visit with him, and to make sure that the powers of attorney would end today unless we find that he is competent, in which case he is free to reinstate the powers of attorney or do anything that anyone of us can do in polite society. That is the best way to handle it.

6

> In the event he is not able to manage his affairs we will have to appoint a permanent guardian. . . .
>
> * * *
>
> There will have to be an accounting of the property. Any moneys spent on his behalf will have to be accounted for to the court.

On August 1, 2016, the court signed an order appointing Janet as "temporary guardian of the person and properties" of Chief Ibru. The order stated its purpose was to "preserve the <u>status quo</u> of all normal business operations and all assets belonging to [Chief] Ibru, pending a full evidentiary hearing before this Court[.]" (Emphasis in original court order). The court also ordered Janet to provide an accounting "as is normally and customarily required of all the properties and expenditures of [Chief] Ibru[,]"[8] and temporarily suspended "all powers of attorney [signed] by [Chief] Ibru[.]"

On September 6, 2016, Chief Ibru passed away intestate. Pursuant to Maryland Rule 10-707(a), Janet completed an inventory of the fiduciary estate signed September 28, 2016, which the court docketed on October 11, 2016. In it, Janet listed $151,925.36 in "cash and cash equivalents" and in the next section, the information report, she noted that $151,199.85 was held in jointly titled accounts (the "Joint Accounts") bearing her and Chief Ibru's names. She disclosed that Chief Ibru owned one checking account in his own name containing $725.51. Janet also completed a "fiduciary's account" report pursuant to Maryland Rule 10-708(a) and disclosed that she had disbursed $94,782.83 while serving

---

[8] Maryland Rule 10-707(a) imposes a duty to file an inventory and information report "[w]ithin 60 days after jurisdiction has been assumed or a fiduciary has been appointed[.]" Chapter 700, Title 10, of the Maryland Rules is entitled "Fiduciary Estates Including Guardianships of the Property."

7

as the temporary guardian of Chief Ibru. According to the fiduciary's account, these disbursements included $37,155.50 in dayshift nursing and $51,481.48 in night-time nursing care and doctor's visits. Additionally, Janet completed an "annual report of guardian of disabled person" pursuant to Maryland Rule 10-206(e), in which she petitioned the court to extend her temporary powers of guardianship over Chief Ibru's property "to encourage reporting from those persons who have control over" his property.[9]

On October 14, Peter filed a motion to terminate Janet's temporary guardianship of Chief Ibru as well as any authority purportedly granted to her pursuant to the Powers of Attorney. Peter argued that any power to act as Chief Ibru's temporary guardian expired on the date of Chief Ibru's death and any actions after his death were beyond the scope of the temporary guardianship order. Peter also requested that the court order Janet to provide an accounting. And, on November 1, 2016, he amended his complaint (the "Amended Complaint"),[10] adding a request for an accounting and the establishment of a constructive trust over Chief Ibru's assets that Janet transferred.

Janet responded to Peter's motion to terminate temporary guardianship, maintaining

---

[9] This petition followed several attempts by Janet to ascertain the location and amount of Chief Ibru's assets in Nigeria. Janet sent a letter to Emanuel Ibru, one of Chief Ibru's children, on September 16, 2016, indicating that she had an "obligation to report [Chief Ibru's] assets pursuant to the [July 29, 2016] court order" which, according to Janet, included "the value and identity of [Chief Ibru's] assets wherever situated." Janet has yet to file an accounting pursuant to the July 29 order.

[10] On August 22, 2016, Peter's counsel, Mr. Andrew Ucheomumu, filed a motion to withdraw, which the court granted. Peter subsequently hired new counsel, who entered their appearance on September 20, 2016. It is unclear whether Peter's complaint was ever amended for a first time by Mr. Ucheomumu, so for clarity, we refer to this complaint as the amended complaint.

that he made "no specific allegation[s] that she ha[d] committed any illegal act" and agreed that her temporary guardianship authority had lapsed due to Chief Ibru's death. She also filed a motion to strike the Amended Complaint on November 16, arguing that, among other things, Peter had attempted to assert "almost entirely new claims for relief." She contended that Peter had essentially received all requested relief in the original complaint, as Chief Ibru's death rendered the Powers of Attorney a nullity. Additionally, Janet averred that Peter had "no standing" to compel Janet to produce an accounting of her actions under the Powers of Attorney, citing that because of Chief Ibru's massive "empire worth millions, if not billions of dollars, . . . [s]uch an act would be frivolous, financially burdensome, and an imposition upon Chief Ibru's and [Janet]'s privacy without any justification."

Then, on February 16, 2017, Janet filed a motion to dismiss, contending that Chief Ibru's death mooted all matters in Peter's original complaint. She denied taking advantage of her father's trust and reiterated that his death extinguished any Powers of Attorney. She averred further that Peter's Amended Complaint was merely an "attempt[] to convert a guardianship matter into an estate matter[.]" Janet insisted that "a Nigerian court would be best suited" to handle the case because an estate case was already open in Nigeria to address Chief Ibru's property; that approximately 99% of his assets were in Nigeria; and that the only asset that Chief Ibru had remaining in Maryland was a bank account with roughly $2,000 in it. After accusing Peter of launching the litigation as a vehicle "to harass [her] and impugn her good character to place himself in a better position to be the executor of his father's estate in Nigeria[,]" Janet requested that the court strike the Amended Complaint, dismiss the case, and order Peter to pay her attorney's fees.

9

On February 22—six days after Janet filed her motion to dismiss—the parties appeared in circuit court to address "all pending motions." Peter had not yet filed an opposition to the motion, nevertheless, the Court began by addressing Janet's motion to dismiss the Amended Complaint "just in case[.]" Janet's counsel argued, in relevant portion, that Peter did not have standing and that the circuit court did not have jurisdiction to consider the case because an estate proceeding was opened in Nigeria and "this is not an estate proceeding." Peter's counsel responded that "we agree on one point. This is not an estate matter." Counsel argued that dismissal was not warranted, as Janet had disclosed that only $2,000 remained of Chief Ibru's money, yet in her inventory in the guardianship she listed approximately $149,000 in joint checking accounts, which she became owner of upon Chief Ibru's death. Janet's counsel responded that Peter could have objected to Janet's appointment as Chief Ibru's temporary guardian, but he did not.

The court made the following ruling orally:

I hate to go out on a limb and dismiss this case, but I am. I think there are standing issues. In reciting some of the history, [Chief] Ibru had resided in Lanham, Maryland with his daughter for a fairly long period of time. Apparently, [Chief] Ibru is worth about $2 billion in Nigeria, most of the assets being there. And as I understand it, there's now an estate case pending there. I think this is an estate case. I don't think it's a declaratory judgment case. You can call it that, but it's really not and I'm not sure the standing to even bring it by one of the other brothers of [Chief] Ibru's daughter. Or in any event, it's a large – obviously large family in any event. I think it appropriate and the right thing to do to order this case dismissed. Thank you all very much.

Shortly thereafter, the circuit court issued an order embodying its decision to grant Janet's motion. The court also awarded Janet $4,500.00 in attorney's fees.

On March 20, 2017, Peter noted his timely appeal to this Court.

10

## DISCUSSION

## I.

## Justiciability

We must determine, as a threshold matter, whether Peter's Amended Complaint petitioning the court to review the validity of the Powers of Attorney remained justiciable in the circuit court following the death of Chief Ibru and the opening of the estate in Nigeria. *See*, *e.g.*, *R.K. Grounds Care v. Wilson*, 235 Md. App. 20, 36 (2017) (whether a court had subject matter jurisdiction to decide an issue is a "threshold matter" that "may be raised at any time, by a party or by the Court"). The circuit court framed the issue as one of standing, ruling that "there are standing issues." But the issues raised implicate the circuit court's subject matter jurisdiction to hear Peter's action as well as Peter's standing to bring the action.

Peter argues that the circuit court had subject matter jurisdiction to hear this case, establish a constructive trust, and render a declaratory judgment. He argues that the alleged fraudulent acts underlying his claims occurred during Chief Ibru's lifetime and that the funds in the joint accounts transferred solely to Janet. Therefore, he contends, the funds at issue are non-probate assets, making this an equitable matter judiciable in circuit court. Additionally, Peter says he has standing to bring this action for declaratory judgment under the Maryland General and Limited Power of Attorney Act ("MGLPAA").

Janet responds that the circuit court correctly dismissed the action because Chief Ibru's death terminated the Powers of Attorney. Janet contends the circuit court decided rightly that "this is an estate case," and is within the Orphan's Court's jurisdiction—not

that of the circuit court. Accordingly, Janet insists, Peter has no standing to seek equitable remedies on behalf of the estate because he is not the personal representative of the estate and has no authority to speak on behalf of Chief Ibru or the estate.[11]

As we next explain, the circuit court had subject matter jurisdiction over the case and Peter had standing to bring the action. We review *de novo* a circuit court's determinations of its own subject matter jurisdiction and a party's standing. *See Holbrook*

---

[11] Janet additionally asserts that Peter's "failure . . . to join necessary parties" including "the late Chief Ibru's estate and the vast majority of the Chief[']s numerous offspring" correctly precluded the circuit court from entering a declaratory judgment because "none of these entities or individuals were, themselves, party to the litigation[.]" Relying on *Tribull v. Tribull*, 208 Md. 490, 503 (1956), she claims that the rest of her siblings, as well as a representative of the estate, were "'necessary parties'" that needed to be joined before the circuit court could exercise jurisdiction in a case "'involving the administration of [an] estate[.]'"

Janet's rationale is flawed. Under Maryland Code (1973, 2013 Repl. Vol.), Courts and Judicial Proceedings Article ("CJP"), § 3-405(a)(1), "[i]f declaratory relief is sought, a person who has or claims any interest which would be affected by the declaration, shall be made a party." This is because "the declaration may not prejudice the rights of any person not a party to the proceeding." *Id.* § 3-405(a)(2). In this case, however, the Amended Complaint did not request the court to determine the substantive rights of the other siblings to inherit Chief Ibru's property or to administer the estate. Instead, Peter brought the action to declare the validity of the Powers of Attorney, account for the funds contained in joint accounts as listed in the guardianship inventory now owned by Janet solely, and review Janet's actions as a fiduciary and agent. Thus, this suit would not affect the rights of Chief Ibru's other children to inherit Chief Ibru's estate, and they were not necessary parties to this action. *Id.* § 3-405(a)(1); *cf. First Nat'l Bank of Md. v. Dep't of Health & Mental Hygiene*, 284 Md. 720, 730-36 (1979) (holding that life beneficiaries and contingent remaindermen of a trust were not necessary parties to a suit construing the trust instrument and that, "[w]hen seemingly necessary but unjoined parties w[ere] only one of several owners or protectors of interest that was subject of litigation, but others were present before court to effectively represent that interest, that party, though normally indispensable, was not required to be joined in order to be bound by judgment entered); *Frey v. McGraw*, 127 Md. 23 (1915) (holding that a decedent-wife's personal "representatives were neither necessary nor proper parties" to a suit to collect a judgment against her husband's estate after her interest in the property, which she had held as a tenant by entirety, devolved upon her death devolved before the action arose).

12

*v. Newell*, 231 Md. App. 451, 453 (2017); *Tomran, Inc. v. Passano*, 159 Md. App. 706, 723 (2004), *aff'd,* 391 Md. 1 (2006).[12]

## A. Subject Matter Jurisdiction

Relying on a Maryland federal district court case—*Libonati v. Ransom*—Peter asserts that, because the allegedly wrongful transfers occurred during Chief Ibru's lifetime, Peter should have been permitted to contest the validity of the Powers of Attorney and their effect on any subsequent transfers. 664 F. Supp. 2d 519 (D. Md. 2009). He contends that the joint accounts transferred solely to Janet, as joint holder of the accounts, when Chief Ibru died, placing the funds outside Chief Ibru's estate as non-probate assets. Because his claims concern title to non-probate assets, Peter urges that the issues are beyond the jurisdiction of a probate court to consider.

Janet, on the other hand, cites to this Court's decision in *Kroll v. Fisher* for the proposition that if an attorney-in-fact mismanaged a decedent's funds during his or her life, the misappropriated funds go directly to the estate, not the party challenging the attorney-in-fact's actions. 182 Md. App. 55 (2007). Janet reasons that this is a probate action and,

---

[12] The parties dispute whether the circuit court's consideration of "extraneous information outside the Complaint and exhibits," including the existence of an ongoing estate case in Nigeria, converted the motion to dismiss to a motion for summary judgment. Peter presses this issue, in part, because he argues that the circuit court should have permitted him "a reasonable opportunity" to respond. Because we rule in Peter's favor, however, and hold that the circuit court erred by granting Janet's motion—regardless of whether the court treated it as a motion to dismiss or for summary judgment—we do not need to resolve this issue. As we explained above, our review is *de novo*. So, for the purposes of the present appeal, it matters only that we "[w]e review all questions of law, including whether summary judgment was properly granted, without deference." *Vito v. Grueff*, 453 Md. 88, 104 (2017) (citations omitted).

had the court issued a decree regarding money she supposedly owed, the judgment would have "*no* compulsion over Chief Ibru's *actual* personal representative nor over [his] estate[.]" (Emphasis in original). By Janet's estimation, "such order would[] constitute a legal nullity, or at best, a sort of 'advisory opinion' applicable to *only* two of the late Chief Ibru's numerous offspring." (Emphasis in original).

As a general matter, a state equity court may not conduct "the administration of a decedent's estate," which is specially "committed to the Orphans' Court." *Tribull v. Tribull*, 208 Md. 490, 499 (1956); *see also Gaver v. Gaver*, 176 Md. 171, 189-90 (1939) ("Ordinarily courts of equity will not intervene in the administration of estates by a probate court except to remedy some evil or establish some right which such courts are powerless to grant or establish." (citations omitted)). Maryland law has long recognized that the Orphans' Court is "a court of special limited jurisdiction, [and] must be confined to the express letter of its authority." *DeFelice v. Riggs Nat'l Bank of Wash.*, 55 Md. App. 476, 478 (1983) (citing *Taylor v. Bruscup*, 27 Md. 219 (1867)). This jurisdiction is a product of statutory law and allows the Orphans' Court to

> conduct judicial probate, direct the conduct of a personal representative, and pass orders which may be required in the course of the administration of an estate of a decedent. It may summon witnesses. The court may not, under pretext of incidental power or constructive authority, exercise any jurisdiction not expressly conferred.

ET § 2-102(a). Implicit in this grant of jurisdiction to orphans' courts is a restriction on the jurisdiction of state equity courts from interfering with the administration of a decedent's estate. *See Gaver*, 176 Md. at 189-90.

14

In *Tribull*, for example, the Court of Appeals considered whether the Orphans' Court could properly exercise jurisdiction to determine the validity of a transfer of title of a bank account, which was effected shortly before the decedent's death. 208 Md. at 493. There, in December of 1945, a woman, Mrs. Tribull, opened an account and placed close to $15,000 in it "in trust for herself and her daughter, [Antoinette], as joint owners, the balance at death of either belonging to the survivor." *Id.* For the next few years, the name of the account remained the same, although Antoinette made occasional withdrawals on her mother's orders. *Id.* at 494. On July 1, 1952, Mrs. Tribull's son, Francis, took her to the hospital. *Id.* On July 3, Francis closed the account and transferred the remaining amount to a new account bearing only Mrs. Tribull's name. *Id.* at 494-95. On July 8, Francis changed the account again—this time changing it from Mrs. Tribull's name alone to a joint account between her and Francis as "joint owners, subject to order of either, the balance at death of either to belong to the survivor." *Id.* (internal quotation marks omitted). Mrs. Tribull passed away on July 13, 1952. *Id.* at 496. Following her death, Francis went to the bank and closed the third account and transferred the remaining money "to a new account in the name of Francis A. Tribull for himself and his wife as joint owners[.]" *Id.* at 497. Francis did not turn the money in the bank account over to the executor of Mrs. Tribull's estate, and Francis's brother, Paul, sued in the Circuit Court of Baltimore City to set aside the transfer of the bank account. *Id.* at 497-98, 492-93. The court granted a motion to dismiss the action, and "expressed the view that the bill could be brought only by the executor, even if he had refused to sue, and that [Paul's] only remedy was to apply

to the Orphans' Court for an order requiring the executor to sue." *Id.* at 499. Paul appealed the circuit court's dismissal of the suit.

On appeal, the Court held that the grant of the motion to dismiss was in error, as the Orphans' Court would be unable to afford relief, as it was without jurisdiction to consider the claim because it was "of an equitable nature." *Id.* at 503. The Court reasoned, relying on its decision in *Noel v. Noel*, 173 Md. 147 (1937), that equity jurisdiction—and not consideration in the Orphans' Court—was appropriate

> "because the jurisdiction of the [O]rphans' court was inadequate and incomplete and did not include, as did the court of equity, the power of the determination of questions of partnership, of the creation of express and implied trusts and their associated relations of fiduciary and beneficiary, *and the determination of title to personalty between conflicting claims on behalf of the estate of the intestate on the one hand, and the mother and sister of the intestate, on the other.* In consequence of its more extensive jurisdiction, and of its superiority of remedy and relief, *equity had paramount authority and will retain its jurisdiction for such relief as may be necessary, and, while so exercising this jurisdiction, further proceedin[g]s on the pending proceedings in the [O]rphans' court should be stayed.*"

*Tribull*, 208 Md. at 502 (quoting *Noel*, 173 Md. at 151) (emphasis added). The Court noted that "the administration of a decedent's estate is committed to the Orphan's Court," but nonetheless concluded that equity jurisdiction was proper because "the only remedy which the Orphans' Court could give would be to direct the executor to bring suit; that Court could not try the issue of the validity of the transfer of the bank account." *Id.* at 499, 503. Therefore, the circuit court—not the Orphans' court—retains jurisdiction over disputes where the equitable title of a decedent's property is at issue.[13]

---

[13] ET § 1-301(b) permits the Orphans' Court to "determine questions of title to personal property not exceeding $50,000 in value for the purpose of determining what

16

In *Libonati*, an elderly man—referred to as "Decedent" by the federal court—executed a durable power of attorney on December 23, 2008, appointing his neighbor, Dora Ransom, as his attorney-in-fact. 664 F. Supp. 2d at 521. On February 5, 2009, Decedent was admitted to the hospital and was later diagnosed with a terminal illness with an estimated three months to live. *Id.* By that time, a form of dementia had deteriorated his mental state to the point that Decedent was unable to care for himself. *Id.* As a result, he moved in full-time with Ransom and her family. *Id.* The same day that Decedent was admitted to the hospital, he "signed a writing purporting to be his Last Will and Testament" naming Ransom as his personal representative and sole beneficiary of his estate. *Id.* On June 5, 2009, Decedent passed away in Ransom's home that she shared with her husband and mother. *Id.*

Ransom submitted documents to Decedent's nieces and sister-in-law—the plaintiffs—stating that "prior to his death, she had transferred at least $350,000 of [Decedent's] assets to herself and designated herself the beneficiary of [Decedent's] transfer on death bank accounts." *Id.* The plaintiffs filed a complaint in the Orphans' Court for Baltimore City contesting the validity of the will, asserting that Decedent "was not legally competent to execute a [w]ill, that the execution of the [w]ill was the product of undue influence and fraud, and that the [w]ill lacked the requisite formalities." *Id.* The plaintiffs also filed a separate action in federal court seeking a declaration that the transfer

---

personal property is properly includable in an estate[.]" Title to assets that pass outside of a decedent's estate by operation of law, however, such as a joint bank account, are not subject to ET § 1-301(b). ET § 1-401 (referring to the definition of "Account," demarcated in the Financial Institutions Article, § 1-204(b)(2)).

17

of assets during Decedent's lifetime was improper, contending that "Ransom, and her co-defendants, through fraud and undue influence, transferred funds from Decedent to herself and designated herself the beneficiary of Decedent's transfer on death accounts." *Id.* at 522. Ransom moved to dismiss the federal claim, arguing that the Orphans' Court proceeding precluded subject matter jurisdiction over the claim in federal court. *Id.*

The federal court began its discussion by noting that "[t]he probate exception[14] does not prevent a federal court from determining the rights of the parties; it prohibits only the administration of assets." *Id.* (citation omitted). Quoting Maryland law, the court remarked that "the Maryland Court of Appeals has found that when the claim requires the determination of 'title to personalty between conflicting claims,' equity jurisdiction is appropriate." *Id.* (quoting *Tribull*, 208 Md. at 502) (additional citations omitted). The court held that it could exercise jurisdiction over the plaintiffs' claim because the issue presented—whether Ransom held proper title to the transfer-on-death accounts—was "clearly one of title." *Id.* at 524. Applying *DeFelice v. Riggs*, *supra*, the court ruled that "'where the proceedings will either directly or effectively involve a determination of title to personal property . . . [t]he Orphans' Courts . . . are simply without jurisdiction to consider this type of question.'" *Id.* (quoting *DeFelice*, 55 Md. App. at 481-82) (alterations in *Libonati*). The court reasoned that the claim in federal court was "distinct and separate"

---

[14] As the federal court in *Libonati* explains, the "probate exception to federal court jurisdiction applies when the district court's adjudication would: 1) 'interfere with the probate proceedings;' 2) 'assume general jurisdiction of the probate;' or 3) assert 'control of property in the custody of state court.'" 664 F. Supp. 2d at 522 (quoting *Markham v. Allen*, 326 U.S. 490, 494 (1946)).

18

from the claim filed in the Orphans' Court, meaning "[t]here [wa]s no danger" its decision would interfere with the administration of Decedent's estate. *Id.* at 523. Further, the court held that the *inter vivos* transfer of funds pursuant to the power of attorney converted the assets into non-probate assets, making it "an issue beyond the jurisdiction of the Orphans' Court." *Id.* Regardless of its decision, the federal court explained, "administration of Decedent's estate will proceed in the Orphans' Court unimpeded." *Id.*

In *Kroll*—the case on which Janet relies—a deceased woman's nephew filed for an accounting in the circuit court for the period that her attorney-in-fact, Barbara Fisher, who was subsequently appointed as her personal representative, managed her finances. 182 Md. App. at 57. The nephew alleged that the personal representative had committed fraud during the time that she was the attorney-in-fact and sought an independent accounting of the estate and restitution for any "malfeasance." *Id.* at 58. Fisher moved to dismiss for lack of standing, which the court granted, reasoning that the Orphans' Court had sole jurisdiction to determine whether to appoint a successor personal representative and what monies, if any, the first personal representative owed to the estate. *Id.* 58-60. The nephew appealed. *Id.* at 60.

On appeal, this Court clarified that "[i]t was not a question of standing, but one of subject matter jurisdiction." *Id.* at 62. We held that the circuit court correctly dismissed the nephew's request for an accounting, as the Orphans' Court was the correct authority "to order such an accounting because [Fisher]'s management of Ms. Kroll's finances prior to her death is relevant to [Fisher]'s duties as personal representative of the estate." *Id.* (citations omitted). We further instructed that, to obtain his requested relief, the nephew

19

could file a claim in Orphan's Court seeking removal of the "personal representative for failing to discharge her obligations and, in that context, request discovery and an order requiring her to account for the management of the decedent's assets prior to the decedent's death." *Id.* at 63. Finally, we observed that, because the action was one by a beneficiary of an estate, requesting an accounting of the estate and alleging mismanagement by the personal representative of the estate, "the recovery of such funds would go directly to the estate." *Id.* Accordingly, we held that the Orphans' Court, and not the circuit court, possessed subject matter jurisdiction over the complaint. *Id.*

We do not read *Kroll* to be applicable in the current case. As the federal district court did in *Libonati*, we distinguish the facts of *Kroll* because "the claim here is that the assets belonging to the decedent were wrongfully transferred by the decedent's attorney-in-fact to herself prior to the decedent passing away." 664 F. Supp. 2d at 524. At some point prior to Chief Ibru's death, pursuant to the Powers of Attorney, Janet became the joint owner—along with Chief Ibru—of at least eight bank accounts containing, in the aggregate, roughly $151,000. When Chief Ibru died, any funds remaining in those accounts passed immediately, by operation of law, to Janet, outside of Chief Ibru's estate—a fact that Janet concedes. Maryland Code (1980, 2011 Repl. Vol.), Financial Institutions Article ("FI"), § 1-204(d).[15] *See also Wagner v. State*, 445 Md. 404, 431-32 (2015)

---

[15] FI § 1-204(d) states, in relevant portion, the following:

(d) *Death of party.* – (1) Upon the death of a party to a multiple-party account, the right to any funds in the account shall be determined in accordance with the express terms of the account agreement.

20

(analyzing the legislative history of FI § 1-204 and stating that "'in the absence of an account agreement that states otherwise, upon the death of one of the parties to a multiple party account[,] the survivors own the funds in the account.'" (quoting *Stanley v. Stanley*, 175 Md. App. 246, 264 (2007) (alteration in *Wagner*))). In this case, the *inter vivos* transfer of funds pursuant to the Powers of Attorney into the jointly held transfer-on-death accounts converted those funds into non-probate assets. *See Libonati*, 664 F. Supp. 2d at 524; *Tribull*, 208 Md. at 502. We hold that the question of whether Janet fraudulently obtained and employed the Powers of Attorney to become the joint owner of the Joint Accounts during Chief Ibru's lifetime is a question of title that is squarely within the scope of the circuit court's equity jurisdiction and "beyond the jurisdiction of the Orphans' Court." *See Libonati*, 664 F. Supp. 2d at 524 (citing *Tribull*, 208 Md. at 499-500).

Moreover, unlike *Kroll*, Janet is not, nor has she ever held herself out to be, the personal representative of Chief Ibru's estate, and Peter is not seeking an accounting for the estate. *See* 182 Md. App. at 62. Accordingly, we hold that the circuit court erred when it concluded that the underlying case was an estate matter and in dismissing the underlying action because an estate was opened in Nigeria.

## B. Standing

Peter argues that he has standing to bring an action against Janet to determine "the validity of the purported Powers of Attorney, to review Janet's conduct under the purported

---

(2) If the account agreement does not expressly establish the right to funds in the account upon the death of a party, or if there is no account agreement, any funds in the account upon the death of a party shall belong to the surviving party or parties.

21

Powers of Attorney, and to order the appropriate relief." To this end, Peter anchors his standing rights in Section 17-103(a) of the Estates and Trusts Article of the Maryland Code, which is part of the MGLPAA. Quoting from the statute, Peter argues that he, a "descendent or presumptive heir" of Chief Ibru, had standing to compel the circuit court to issue a declaratory judgment on the status of both Powers of Attorney documents entered by Chief Ibru, and to order further relief, including an accounting and a constructive trust.

In response, Janet contends that Peter has no authority to act on behalf of the estate—or other potential heirs—as he did not even assert that he was acting as a personal representative or executor to his father's estate or on behalf of his other siblings. Further, Janet argues that any plausible standing to sue that Peter may have had pursuant to ET § 17-103(a) regarding the Powers of Attorney documents effectively lapsed after the death of Chief Ibru. Therefore, Janet reasons, because the court correctly surmised that Peter had no authority to speak for Chief Ibru or his children—in Maryland or elsewhere—it correctly dismissed the instant case.

In order "'to invoke the judicial process in a particular instance[,]'" a litigant must have standing. *Long Green Valley Ass'n v. Bellevale Farms, Inc.*, 205 Md. App. 636, 652 (2012) (quoting *Adams v. Manown*, 328 Md. 463, 480 (1992)). The legislature may choose to enact statutes to confer standing in certain instances. *See id.* ("Standing rests on 'a legal interest such as one of property, one arising out of a contract, one protected against tortious invasion, or one founded on a statute which confers a privilege.'" (quoting *Comm. for Responsible Dev. on 25th St. v. Mayor & City Council*, 137 Md. App. 60, 72 (2001) (additional citation and internal quotation marks omitted)). Here, the General Assembly

enacted ET § 17-103(a), which sets out a broad list of persons who "may petition a court

to construe a power of attorney or review the agent's conduct, and grant appropriate

relief[]" including:

(1) The principal or the agent;
(2) A guardian, conservator, or other fiduciary acting for the principal;
(3) A person authorized to make health care decisions for the principal;
(4) The principal's spouse, parent, or descendant;
(5) An individual who would qualify as a presumptive heir of the principal;
(6) A person named as a beneficiary to receive any property, benefit, or contractual right on the principal's death or as a beneficiary of a trust created by or for the principal that has a financial interest in the principal's estate;
(7) A governmental agency having regulatory authority to protect the welfare of the principal;
(8) The principal's caregiver or another person that demonstrates sufficient interest in the principal's welfare; and
(9) A person asked to accept the power of attorney.

The question of standing in this case turns on whether ET § 17-103(a) confers

standing on Peter to bring the underlying action. In any case involving statutory

construction, our goal "'is to determine and implement the legislative intent.'" *Breck v.*

*Md. State Police*, 452 Md. 229, 244 (2017) (quoting *Evans v. State*, 396 Md. 256, 340-41

(2006)). "Statutory construction begins with the plain language of the statute, and ordinary,

popular understanding of the English language dictates interpretation of its terminology."

*Kushell v. Dep't of Nat. Res.*, 385 Md. 563, 576 (2005) (citation omitted). This follows

logically from the axiom: "'the Legislature is presumed to have meant what it said and said

what it meant.'" *Toler v. Motor Vehicle Admin.*, 373 Md. 214, 220 (2003) (quoting *Witte*

*v. Azarian,* 369 Md. 518, 525 (2002)). If the statutory language is unambiguous when

23

interpreted pursuant to its plain meaning, we look no further. *Kushell*, 385 Md. at 577

(citation omitted). If we cannot ascertain legislative intent by statutory language alone,

> we may, and often must, resort to other recognized indicia—among other
> things, the structure of the statute, including its title; how the statute relates
> to other laws; the legislative history, including the derivation of the statute,
> comments and explanations regarding it by authoritative sources during the
> legislative process, and amendments proposed or added to it; the general
> purpose behind the statute; and the relative rationality and legal effect of
> various competing constructions.

*Witte*, 369 Md. at 525-26 (citations omitted).

We begin with an examination of the plain language of ET § 17-103 and consider

how terms contained within the statute are defined within the Estates and Trusts Article.

Pursuant to Title 17, an "agent" "means a person granted authority to act for a principal

under a power of attorney, whether denominated an agent, attorney-in-fact, or otherwise."

ET § 17-101(b)(1). A "principal" is "an individual who grants authority to an agent in a

power of attorney." ET § 17-101(e). Chief Ibru (the principal) granted authority to act on

his behalf to Janet (the agent) via the Powers of Attorney. Peter is one of Chief Ibru's

children and is therefore a "descendant" of Chief Ibru. ET § 17-101(a)(4). Because Peter

is undoubtedly a descendant of Chief Ibru, it is not necessary to consider whether he also

qualifies as a "presumptive heir" of Chief Ibru.

Although we do not perceive any relevant ambiguity in the statute, we note that the

history of the adoption of the MGLPAA demonstrates that the General Assembly intended

to confer standing on individuals such as Peter. In 2006, the National Conference of

Commissioners on Uniform State Laws (the "Commission") drafted and approved the

"Uniform Power of Attorney Act" ("UPOAA") in response to a perceived "increasing

24

divergence" in how states dealt with issues stemming from powers of attorney.  Unif.

Power of Att'y Act intro. note (Unif. Law Comm'n 2006).   Based on the results from a

multi-state survey of what respondents would like included in a comprehensive power of

attorney act, the Commission sought to draft model legislation that would, among other

objectives, "include remedies and sanctions for abuse by the agent[.]" *Id.*

To accomplish this, the Commission created § 116, a "comprehensive list of persons

that may petition the court to review the agent's conduct[.]" *Id.* (summarizing the purposes

of provisions included in the UPOAA).  Section 116—entitled Judicial Relief—specifies

the persons who may petition the court to review the actions of an agent and contains the

identical text as later adopted by the Maryland General Assembly at ET § 17-103.  The

comment accompanying § 116, in relevant portion, states:

> The primary purpose of this section is to protect vulnerable or incapacitated
> principals against financial abuse.  Subsection (a) sets forth broad categories
> of persons who have standing to petition the court for construction of the
> power of attorney or review of the agent's conduct, including in the list a
> "person that demonstrates sufficient interest in the principal's welfare"
> (subsection (a)(8)). . . .
>
> * * *
>
> Section 116 . . . provides what, in many circumstances, may be the only
> means to detect and stop agent abuse of an incapacitated principal.[16]

Shortly after the UPOAA was promulgated, the Maryland General Assembly began

---

[16] The comment to UPOAA § 116 also states that § 116's inclusive "breadth" is intended to contrast the narrow list of "persons who can request an agent to account for transactions conducted on the principal's behalf" to "preserv[e] the principal's financial privacy."

efforts to revamp statutory provisions regarding powers of attorney. During several legislative sessions, beginning in 2007, these efforts were unsuccessful.[17] Then, in 2010 House Bill 659[18] was introduced—titled the Maryland General and Limited Power of Attorney Act (Loretta's Law)[19]—which imported a few provisions of the UPOAA verbatim, including § 116. 2010 Md. Laws, ch. 689 (H.B. 659).[20]

The "Fiscal and Policy Note" for each bill created during the 2010 legislative session contains a "Background" section that specifically indicated an intent to import and adopt several portions of the UPOAA into the MGLPAA. S.B. 309, 2010 Leg., Reg. Sess.

---

[17] The first iteration of the Maryland General and Limited Power of Attorney Act was introduced in 2007 as Senate Bill 185 and subsequently cross-filed with House Bill 961. Both bills were entitled the "Maryland Uniform Power of Attorney Act" and proposed that several provisions of the UPOAA, including § 116, be imported into Maryland law. S.B. 185, 2007 Leg., Reg. Sess. (Md. 2007); H.B. 961, 2007 Leg., Reg. Sess. (Md. 2007). Similar versions of these bills were reintroduced in both the House and the Senate each year until the Maryland General and Limited Power of Attorney Act was passed in 2010. Senate Bill 309 (cross-filed with House Bill 483) and House Bill 659 (cross-filed with Senate Bill 519).

[18] During the 2010 legislative session, Senate Bill 309 (cross-filed with House Bill 483)—originally titled the "Uniform Power of Attorney Act"—was filed, which sought to adopt a bill that was nearly identical to the UPOAA with a few limited changes. 2010 Md. Laws, ch. 690 (S.B. 309). Neither House Bill 483 nor Senate Bill 519—the cross bill to House Bill 659—made it out of committee.

[19] "Loretta's Law" is a reference to a 2007 Maryland case in which Patricia Skresz, the agent to a power of attorney, pleaded guilty to theft after illegally obtaining funds from Loretta Soustek, her great aunt and principal. *State v. Patricia A. Skrzesz*, Case No. 02-K-07-000168 (Cir. Ct. Anne Arundel Cty., Md., 2007).

[20] During the amendment process, Senate Bill 309 was modified to reflect the contents of House Bill 659, which adopted numerous portions of the UPOAA, including § 116. Both bills were subsequently enrolled and signed by the Governor. 2010 Md. Laws, ch. 689 (H.B. 659); 2010 Md. Laws, ch. 690 (S.B. 309).

(Md. 2010), Fiscal and Policy Note, at 4; H.B. 659, 2010 Leg., Reg. Sess. (Md. 2010), Fiscal and Policy Note, at 4. The Fiscal and Policy Note also sets out the legislature's intent that "[t]he bill appl[y] to all powers of attorney, with specified exceptions[]" that are inapplicable here. The legislature codified this intent in ET § 17-109. Section 17-109 governs the "[s]cope of title," and states that, except for those powers of attorney enumerated in § 17-109(b), which are inapplicable here, Title 17 "applies to all powers of attorney." *See also* ET § 17-105(b) ("This section applies to all powers of attorney.").[21]

The Powers of Attorney at issue here were created and executed in Maryland. Nothing in ET § 17-103 suggests that the location of a principal's estate is relevant to the issue of standing to petition a court to review a power of attorney or an agent's conduct. Because Peter is a descendant of Chief Ibru, we hold that Peter has standing under ET § 17-103(a)(4) to petition the court to review Janet's actions as an agent and construe the validity of the Powers of Attorney that were purportedly executed in Maryland and, by their terms, governed by Maryland law. Having concluded that the underlying action was within the circuit court's subject matter jurisdiction and that Peter had standing to bring it, we hold that the circuit court erred by dismissing the case.[22]

_____

[21] The General Assembly's placement of the MGLPAA in the Estates and Trusts Article does not limit its application to cases involving estates and trusts. Indeed, the General Assembly made clear that the law was to apply to "all powers of attorney." Various other provisions codified within the Estates and Trusts Article also apply to actions involving guardianships and fiduciary relationships. *See, e.g.*, *In re Rosenberg*, 211 Md. App. 305, 320–21 (2013) (interpreting ET §§ 13-201 and 13-221 to reject a claimant's argument that the circuit court should have considered "less restrictive alternatives to a guardianship of the [claimant's] property").

[22] Peter also argues that the circuit court violated the separate-document rule by not

27

## II.

## Award of Attorney's Fees

Peter argues that the circuit court improperly granted Janet $4,500 in legal fees because it lacked "any factual evidence to support the [] award [and had] no legal basis to do so." Peter contends that the court's ability to award attorney's fees is contingent on the presence of "a contract or a statute" and that absent authority affirmatively granting the ability to award fees, "each party is responsible to pay his or her own attorney's fees." Additionally, Peter avers that for Janet to be eligible for attorney's fees, she had to either plead them in her initial pleadings, or file promptly after the grounds arose that would allow for an award of attorney's fees.

Janet responds that she had requested in her motion to dismiss that the court order Peter to pay attorney's fees and that Peter's "unjustified challenge" to her guardianship caused her to incur the need to obtain legal counsel.

As we stated recently in *Pinnacle Group, LLC v. Kelly*, "[w]e review a trial court's decision to award attorneys' fees and costs for abuse of discretion. A trial court abuses that discretion when it disregards established principles or adopts a position that no reasonable person would accept." 235 Md. App. 436, 476 (internal citations omitted), *cert. denied*, 459 Md. 188 (2018). Additionally, the record must clearly indicate that the trial court has exercised its discretion or else reversal is required. *See Scully v. Tauber*, 138 Md.

---

entering a separate order declaring the parties' rights, and that the circuit court when it considered, and ruled on, Janet's motion to dismiss the Amended Complaint six days after it was filed. Because we determined that the circuit court erred in granting Janet's motion to dismiss Peter's action, we need not resolve these issues.

App. 423, 431 (2001) (citing *Nelson v. State*, 315 Md. 62, 70 (1989) ("If the judge has discretion, he must use it and the record must show that he used it.")).

"Maryland generally adheres to the common law, or American rule, that each party to a case is responsible for the fees of its own attorneys, regardless of the outcome." *Friolo v. Frankel*, 403 Md. 443, 456 (2008). Several exceptions to this general rule exist, including: "an express contractual provision" between the parties, "statutory authority" permitting a trial court to award attorneys' fees in favor of one party against another party, "or the application of Md. Rule 1-341." *Smith v. Luber*, 165 Md. App. 458, 471 (2005) (citations omitted). In this case, no contractual agreement between the parties exists; nor does either party direct us to applicable statutory law[23] that allows for the award of attorneys' fees. Therefore, the inquiry is whether Maryland Rule 1-341 is applicable.

Maryland Rule 1-341(a) permits a party to petition the court to award attorneys'

---

[23] Janet contends that the trial court was permitted to award attorney's fees pursuant to ET § 13-704(c). Section 13-704(c) provides the following, in relevant portion:

(1) On the filing of a petition for attorney's fees made in reasonable detail by an interested person or an attorney employed by the interested person, the court may order reasonable and necessary attorney's fees incurred in bringing a petition for appointment of a guardian of the person of a disabled person *to be paid from the estate of the disabled person*.
(2) Before ordering the payment of attorney's fees under paragraph (1) of this subsection, the court shall consider:
   (i) The financial resources and needs of the disabled person; and
   (ii) Whether there was substantial justification for the filing of the petition for guardianship.

(Emphasis added). The plain language of ET § 13-704(c) demonstrates that even if the court were to award attorney's fees to Janet under this statue, the award would be taken from *Chief Ibru's estate* and not assessed against Peter. Therefore, any award of attorneys' fees against Peter under this theory would be in error.

fees for an "unjustified proceeding" brought by an opposing party and allows a trial court to award appropriate fees

> [i]n any civil action, if the court finds that the conduct of any party in maintaining or defending any proceeding was in bad faith or without substantial justification, the court, on motion by an adverse party, may require the offending party or the attorney advising the conduct or both of them to pay to the adverse party the costs of the proceeding and the reasonable expenses, including reasonable attorneys' fees, incurred by the adverse party in opposing it.

Rule 1-341(b) then sets forth what the party requesting attorneys' fees must file in order for the court to consider the request. Specifically, Rule 1-341(b)(3)(A) requires a requesting party to file a "statement in support of a request" containing the following information regarding attorneys' fees:

> (i) a detailed description of the work performed, broken down by hours or fractions thereof expended on each task;
> (ii) the amount or rate charged or agreed to in writing by the requesting party and the attorney;
> (iii) the attorney's customary fee for similar legal services;
> (iv) the customary fee prevailing in the attorney's legal community for similar legal services;
> (v) the fee customarily charged for similar legal services in the county where the action is pending; and
> (vi) any additional relevant factors that the requesting party wishes to bring to the court's attention.

Prior to ordering an award under Rule 1-341(a), "a court must make an explicit finding that a party conducted litigation either in bad faith or without substantial justification. This finding should be supported by a brief exposition of the facts upon which it is based." *URS Corp. v. Fort Myer Constr. Corp.*, 452 Md. 48, 72 (2017) (citations, alteration, and quotation marks omitted).

30

Returning to the case on appeal, Janet included in her motion to dismiss a request that "[Peter] be ordered to pay attorney's fees of [Janet] in the defense of this matter[]" but did not specify an amount or elaborate on reasons why attorney's fees were necessary or appropriate. In the order granting Janet's motion to dismiss, the trial court included the following: "**ORDERED**, that [Janet] is hereby granted reasonable attorney's fees in the amount of $4,500[.]" (Emphasis in original). The court provided no reasoning for awarding $4,500 in attorney's fees, however, leaving us no record to review. *See Fort Myer*, 452 Md. at 72 (requiring a brief reasoning behind the court's decision to impose sanctions, including attorney's fees). Janet failed to provide a statement specifying why attorneys' fees were warranted or why $4,500 was a proper amount. And, the circuit court provided no justification as to why it chose to award attorneys' fees and no explanation of how it calculated the award. Whatever unstated justification the court may have had, its decision to award attorney's fees to Janet is even less able to withstand scrutiny given our holdings above that the court erred by finding in Janet's favor and dismissing Peter's claims. Therefore, we hold that the circuit court abused its discretion when it awarded attorneys' fees against Peter in favor of Janet.

> **JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED AND REMANDED FOR CONSIDERATION ON THE MERITS. COSTS TO BE PAID BY APPELLEE.**